723 So.2d 440 (1998)
Charles M. CREEL, et ux., Plaintiffs-Appellants,
v.
LOUISIANA PEST CONTROL INSURANCE, INC. Defendant-Appellee.
No. 98-146.
Court of Appeal of Louisiana, Third Circuit.
August 5, 1998.
Opinion Granting Rehearing September 14, 1998.
Writ Granted December 18, 1998.
*441 Roy Seale Halcomb, Jr., Alexandria, for Charles M. Creel, et ux.
James Berry Reichman, Alexandria, for Louisiana Pest Control Insurance Company.
Before YELVERTON, GREMILLION, and PICKETT, Judges.
GREMILLION, Judge.
The plaintiffs, Charles M. (Michael) and Linda Creel, appeal a judgment of the trial court finding Roy L. Slay, the president of Ray's Pest Control, Inc., an insured under a commercial general liability policy issued by Louisiana Pest Control Insurance Company, Inc. (LPCI) to Ray's. In so finding, the trial court held that coverage was precluded pursuant to an automobile use exclusion contained in the policy. We reverse for the following reasons and award damages.

FACTS
On August 11, 1993, the Creels, along with their three minor children, Cristin, Candace, and Cammie, were traveling west on Louisiana Highway 28 in their 1988 Chrysler LeBaron. Slay, who was in the course and scope of his employment with Ray's, was traveling east on Highway 28 in a 1989 Ford truck. The accident occurred at the intersection of Highway 28 and Louisiana Highway 1207 when Slay attempted to turn left onto Highway 1207 and collided head-on with Linda's vehicle. As a result of this accident, Linda and Michael were seriously injured and their children suffered minor injuries. *442 Slay was cited for making an improper left turn.
The Creels filed suit against LPCI, individually and on behalf of their children, alleging that Slay was employed by and acting within the course and scope of his employment with Ray's, and that coverage was provided for his actions through an insurance policy issued to Ray's by LPCI. In addition to filing an answer, LPCI filed exceptions of no right of action and/or nonjoinder of an indispensable party based on the Creels settlement and release of Ray's and Slay in a suit filed in Catahoula Parish. LPCI also filed a motion for summary judgment arguing that the commercial general liability policy excluded coverage for damages arising from the use of an automobile, and that the truck was owned by an insured, Slay. This motion was denied by the trial court.
LPCI amended its answer three additional times. It first alleged that the commercial general policy did not afford coverage for the damages suffered by the Creels. Next, it admitted that Slay was employed by Ray's and was acting within the course and scope of his employment, but, denied that Ray's was vicariously liable for Slay's actions. Finally, it admitted that Slay was driving east on Highway 28, but denied that Slay was the owner of the Ford truck.
Following a trial on the merits, the trial court issued Reasons for Judgment finding that the insurance policy issued by LPCI did not provide coverage. The trial court held that Slay was an insured under the terms of the commercial liability insurance policy issued by LPCI, but that coverage was precluded pursuant to the automobile use exclusion contained in the policy. A judgment was rendered on September 19, 1997. The Creels appeal this finding.

ISSUES
The Creels raise only one assignment of error on appeal. They argue that the trial court erred in interpreting the term "insured" to include Slay, an executive officer, as an insured while performing his employee duties when the language of the policy excludes executive officers from being insureds. We agree with the Creels, and reverse.

LAW AND DISCUSSION
The interpretation of an insurance contract is a legal question. Mike Hooks, Inc. v. JACO Servs., Inc., 95-1485 (La.App. 3 Cir. 5/8/96); 674 So.2d 1125, writ denied, 96-1924 (La.11/1/96); 681 So.2d 1264. On appeal, the reviewing court is confined to determining whether the trial court was legally correct in its interpretation of the insurance contract. Weeks v. T.L. James & Co. Inc., 626 So.2d 420 (La.App. 3 Cir.1993), writs denied, 93-2909, 93-2936 (La.1/28/94); 630 So.2d 794.
In Ledbetter v. Concord General Corp., 95-809 (La.1/6/96); 665 So.2d 1166, the supreme court listed several legal axioms concerning the interpretation of insurance policies. The court stated:
An insurance policy is an agreement between the parties and should be interpreted by using ordinary contract principles. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993). The parties' intent, as reflected by the words of the policy, determine the extent of coverage. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. La. Civ.Code art.2047; Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., 93-0911 (La.1/14/94); 630 So.2d 759, 763. If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. Pareti v. Sentry Indemnity Co. 536 So.2d 417, 420 (La.1988).
Exclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured. Garcia v. St. Bernard Parish School Board, 576 So.2d 975, 976 (La.1991). However, the rule of strict construction does not "authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists." Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 75 (1939). Insurance companies have the right to limit coverage in any manner they desire, so long as the limitations *443 do not conflict with statutory provisions or public policy. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94); 634 So.2d 1180, 1183.
Id. at pp. 3-4; 665 So.2d at 1169.
The trial court held that the automobile use exclusion applied in this instance to exclude coverage because Slay was an insured as defined under the policy either as an executive officer or an employee. The trial court relied on Fontana v. Zurich Insurance Co., 430 So.2d 718 (La.App. 2 Cir.), writ denied, 438 So.2d 569 (La.1983), where the court held that an individual can be both an executive officer and an employee of a corporation. In support of its finding, that court looked to the Workers' Compensation Act and cited La.R.S. 23:1044, which provided that "[e]very executive officer ... shall be an employee of such corporation under this chapter."
However, we find that Fontana is distinguishable from the case sub judice for the following reasons. Fontana and the cases discussed therein dealt with cross-employee exclusions which excluded coverage to employees, injured through the actions of their co-employees, because of their entitlement to workers' compensation. Here, non-employee plaintiffs are seeking coverage as the result of the tortious actions of an employee, thus, this is not an instance where the injured plaintiffs have recourse to workers' compensation benefits.
Further, the language of the policy at issue specifically excludes an executive officer from being an employee. The policy issued by LPCI provides:
Section II WHO IS AN INSURED
1. If you are designated in the Declarations as:
....
c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
2. Each of the following is also an insured:
a. Your employees, other than your executive officers but only for acts within the scope of their employment by you.

(Emphasis added). Under the language in (1)(c), an executive officer is only an insured if they are performing their duties as an executive officer. Pursuant to (2)(a), the employees of Ray's, other than its executive officers are also insureds under the policy. The term "executive officers" is not limited as it is in (1)(c) by language restricting when an executive officer is an insured. Thus, under the plain wording of the definition, an executive officer is precluded from being an employee and, thus, an insured except when performing his executive duties. Since we find that the language of the policy is clear and unambiguous, we must enforce the policy as written without resort to parol evidence concerning the intent of the parties with regard to what they intended the policy to provide.
Slay testified that after he purchased Ray's, he assumed new duties associated with his position as president of the corporation. These duties included attending and participating in corporate meetings, the hiring and firing of personnel, handling financial dealings, and making corporate decisions. At the time of the accident, Slay was en route to spray a house for insects and pests. Under these facts, we find that he was not performing executive duties when the accident occurred, thus, the language of the policy plainly excludes him from being an employee and an insured. Based on the foregoing, we find that the trial court erred as a matter of law in finding that Slay was an insured under the policy issued by LPCI to Ray's.
Accordingly, we find that the automobile use exclusion[1] does not apply in this *444 instance because Slay was not an insured. Since LPCI admitted that Slay was acting within the course and scope of his employment with Ray's, we find that the commercial general policy issued by it provides coverage for the damages suffered by the Creels.

DAMAGES
Michael and Linda filed suit individually and on behalf of their three minor children seeking damages for the injuries they suffered in the accident. We will discuss Linda's and Michael's claims separately.

LINDA CREEL

A. General Damages
Linda, the driver of the vehicle, received the most serious injuries of all involved in the accident. She suffered a closed head injury, a basilar skull fracture, a right posterior temporal hemorrhagic contusion, a punctate intracerebral hemorrhage of the left frontal lobe, fractures of the left orbital wall, the lateral maxillary wall, the apex of the left orbit, and the cribriform plate, a Grade I-II open fracture of the left femur, and a fracture of the left ulna. She suffered a ten centimeter stellate laceration over the posterior olecranon of her left elbow involving the triceps tendon, two one-centimeter lacerations about her left lateral thigh, a four centimeter right anterior knee wound, deep to the fascia and investing the patella, and several facial lacerations, which exposed the frontal and temporal bones, and a laceration of the temporalis muscle. Six of Linda's teeth were loosened in the accident, two teeth were fractured, there was swelling around the left zygomatic arch from an apparent fracture, she had a restricted opening, and symptoms of acute TMJ dysfunction. The two fractured teeth were crowned, and she may require future root canals on the teeth which suffered trauma.
After arrival at the St. Francis Cabrini Hospital in Alexandria on August 11, 1993, Linda was taken into surgery for repair of her facial lacerations. She returned to surgery on August 12, 1993, for open placement of a metal rod in her fractured femur, and open reduction and internal fixation of her left ulna.[2] The lacerations to her left knee and elbow were also repaired at this time. Linda remained in the intensive care unit for thirteen days.
On August 30, 1993, she was transferred to St. Francis Cabrini Hospital's traumatic brain injury rehabilitation facility. While in this facility, Linda underwent physical, occupational, and speech therapies in order to recover from her brain injuries. During this time, she complained of blurred vision, and a finding of possible traumatic optic neuropathy was noted. She was required to wear contact lenses after her injury until August 5, 1995. Due to her symptoms of acute TMJ dysfunction, an impression was taken and a TMJ splint was made and applied to help relieve the inflammation of her left temporomandibular joint. Psychological tests were administered to Linda by Dr. Stuart Kutz, a neuropsychologist. These tests revealed that she suffered mild cognitive deficits in visual-facial dysfunction, and deficiencies in higher order reasoning and problem solving. Linda was released from the rehabilitation facility on October 15, 1993, one and a half months after her admission.
Following her release, Linda underwent a course of cognitive rehabilitation with Dr. James Quillin, a neuropsychologist. After fifty-eight visits between October 23, 1993 and May 9, 1994, Dr. Quillin readministered the psychological tests to Linda. Although she had improved in some categories, the tests results showed that her verbal memory had not improved. Dr. Quillin saw Linda again on April 8, 1997, at which time he administered the same tests and one additional test. Although her tests results had improved, Linda's verbal memory showed no improvement. The additional test showed that she had difficulty with verbal storage of information, with learning verbal information, and then retrieving it. Dr. Quillin stated that Linda's brain dysfunction was permanent.
*445 Linda's personality also underwent a change following her brain injuries. Immediately following the accident, Dr. Quillin stated that she was impulsive and that her husband reported her being outspoken. However, after her frontal lobe injury had improved she became more passive because she realized the difficulties she was having with thinking and remembering. He stated that she has become more dependent upon her family, and experiences anxiety whenever she is taken out of familiar surroundings, which further impairs her ability to perform.
On April 5, 1996, Linda suffered a seizure and was hospitalized for evaluation. A CT scan and an MRI revealed a small arachnoid cyst beneath the posterior right temporal lobe of her brain and a possible subarachnoid cyst beneath the posterior right temporal lobe. Dr. Riad Hajmurad stated that this was consistent with the areas of Linda's brain which were injured in the accident. He further stated that this damage was permanent and could cause seizures. Linda was hospitalized again due to a seizure on March 11, 1997, while she was nine months pregnant with her fourth child. At this time, she was placed on Dilantin, an anti-convulsant, which she will have to continue taking for at least five years. If she is seizure free for five years, Dr. Hajmurad stated that he may consider taking her off the medication. If her seizures continue, she will have to be followed closely and continue taking medication all of her life, which could include further hospitalizations. Dr. Hajmurad estimated that Linda's medical expenses could range between $500.00 to $10,000.00 per year depending if further hospitalizations are required.
On February 23, 1994, Linda was seen by Dr. Douglas Gamburg, an orthopedic surgeon, because of the pain she was having in her left knee and the difficulty she had climbing and descending stairs. Dr. Gamburg noted that she had a markedly positive posterior drawer sign, which is a sign of disruption or deficiency of the posterior cruciate ligament. He felt that Linda's anterior cruciate ligament was torn in two as a result of the August 11, 1993 accident. Dr. Gamburg prescribed that Linda wear a brace on that knee. On March 3, 1997, Linda complained of intermittent discomfort and a sense of weakness in her knee. Dr. Gamburg stated that Linda's options were to either continue wearing the brace and restricting her activities or a surgical procedure to graft a ligament in place of the posterior cruciate ligament. Linda opted for the more conservative course of treatment. However, Dr. Gamburg stated that the surgical procedure remains an option for the future if the condition of her knee deteriorates. He estimated that this surgery would cost approximately $12,000.00 to $15,000.00.
As a result of the lacerations she suffered in the accident, Linda has conspicuous permanent scars on her right medial thigh, left elbow, left temple, left ulnar wrist down the ulnar side of the forearm, and left lateral thigh. The scar on her left thigh was graded as a severe deformity by Dr. John McCabe, a plastic and reconstructive surgeon. He stated that repair of the scar would be difficult and would not result in enough improvement to make it worthwhile.
Linda's past medical expenses totaled $163,846.59.
Considering the severity of her injuries, we award Linda $750,000.00 in general damages, $163,846.59 in past medical expenses, and $20,000.00 in future medical expenses.

B. Loss of Earning Capacity
Linda also seeks damages for her loss of future earnings and earning capacity. She claims that she suffered damages worth $347,645.00.
In Batiste v. New Hampshire Insurance Co., 94-1467, pp. 3-4 (La.App. 3 Cir. 5/3/95); 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95); 660 So.2d 472, the court explained:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working *446 or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Finnie v. Vallee, 620 So.2d 897 (La.App. 4 Cir.), writ denied, 625 So.2d 1040 (La.1993).
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Finnie, 620 So.2d at 901.
Linda testified that her prior work history included data input positions at Beauregard Memorial Hospital and Rapides General Hospital, and positions at Hanna Abington Motors, a department store in DeQuincy, while attending Louisiana College, and as a candy striper at Beauregard Memorial Hospital. Linda testified that she left college when she married Michael, and that she stopped working when her first child was born. She remained unemployed up to date of the accident, but planned to return to the work force when her youngest child entered school.
Lenard Michels, a vocational rehabilitation consultant, testified that a labor market access survey was conducted to determine that 2,426 jobs were available to Linda in Rapides Parish prior to her accident. From this survey, he calculated that her average weekly would have been $336.00. After the accident, Michels stated that there were no jobs or weekly wage available to Linda because he did not feel that she was an appropriate candidate for returning to work, or that there were any type of rehabilitation services available to prepare her to return to work.
Dr. Pat Culbertson, an economics professor and consultant, determined that Linda had a life expectancy of forty-eight years and a work life expectancy of twenty-seven years. This figure was based on the fact that she did not intend to return to the work force until the year 2,000, when her youngest child entered school. Using a discount rate of seven percent and a wage increase factor of five percent, Dr. Culbertson calculated that the present value of Linda's loss of earnings based on a wage of $366.00 per week was $347,645.00.
LPCI presented the testimony of Dan Cliffe, a certified public accountant specializing in economic analysis and the determination of economic losses. He disagreed with Dr. Culbertson's determination that Linda had a work life expectancy of twenty-seven years. He stated that Linda's work life expectancy was 18.7 years since she was inactive at the time the accident occurred. His calculations were also based on a seven percent discount factor, however, he utilized two different wage increase factors, two percent on the low side and five percent on the high side. Cliffe determined that if Linda returned to the work force when her youngest child was six years old at a weekly wage of $337.00 per week, her lost wages would be $50,820.00 on the low side and $55,300.00 on the high side. If she waited until her youngest child was ten years old, he determined that her lost wages would be $38,820.00 on the low side and $42,230.00 on the high side.
After reviewing the evidence, we find that Linda is now unemployable and that she has suffered a loss of earning capacity as a result of her injuries. We award her $347,645.00 in damages.

MICHAEL CREEL
Michael was also seriously injured as a result of this accident. He incurred a *447 frontal scalp laceration and a closed head injury described as a serious concussion type injury from which he fully recovered. He suffered a comminuted fracture of the left ulna and was in a long arm cast for four and one-half months. When the fracture failed to heal properly, surgery was performed on Michael's arm to repair the fracture with a plate and screws and a bone graft from his pelvic bone. He has a laceration on his left forearm as a result of this fracture, and suffers from pain with increased activity and weather changes. Michael may undergo surgery in the future to remove the plate and screws from his forearm. Dr. Gamburg stated that the bone will not recover full strength until the plate and screws are removed. This surgery will cost approximately $5,000.00.
While at Rapides Regional Medical Center, Michael remained in the intensive care unit for one day and then was transferred to a private room. He was discharged from the hospital on August 16, 1993. He was released to light-duty work by Dr. Gamburg on March 25, 1994, and released without restrictions on May 6, 1994. After reviewing the evidence, we award Michael general damages in the amount of $100,000.00, past medical expenses of $25,731.75, and future medical expenses of $5,000.00.
Michael is also seeking damages for past lost wages for the six months he was restricted from working. He testified that he was earning approximately $2,400.00 per month before he was injured. Records from the Department of Health and Human Services show that he earned $28,989.74 in 1992, $26,423.68 in 1991, and $29,731.21 in 1990. The average monthly wage earned by Michael over the three years preceding this accident was $2,365.00. Thus, we award him past lost wages in the amount of $14,190.00.

CRISTIN, CANDACE, AND CAMMIE CREEL
Of the Creels' minor children, Cristin received the most serious injuries. She suffered an abdominal contusion from her seat belt in the collision. After arriving at the emergency room of Rapides Regional, Cristin was admitted to the hospital in order to rule out internal injuries, especially injury to the small bowel. She was released from the hospital on August 13, 1994. Her medical expenses totaled $4,495.45.
Neither Candace nor Cammie received serious injuries as a result of this accident. Both were taken to Rapides Regional and examined for injuries. Candace suffered abdominal and back contusions, and Cammie abdominal contusions. They were both released from the hospital that same day. Candace's medical expenses totaled $692.50, while Cammies' totaled $453.00.
Mary Beth Normand, who witnessed the accident, testified that the children were screaming, crying, and trying to get out of their vehicle when she reached it. She testified that Cammie clung to her immediately and would not let go of her. She said that all three complained that their stomachs were hurting, and all three had abrasions from their seat belts. She testified that Cristin complained that her insides were hurting. Mary Beth testified that she rode to the hospital in the ambulance with the children because Cammie did not want her to leave them. She stated that all three children were screaming and crying.
Gladys Normand, Michael's mother, testified that when she reached the hospital, all three children were crying and wanting to be held. After they were released from the hospital, Gladys stated that they all had nightmares, especially Cristin. She said that the children told her about the accident, how they felt when they were trapped in the car, and that they did not think anyone would get them out of the car.
Considering the foregoing, we award $5,000.00 in general damages to Cristin, and $2,500.00 each to Candace and Cammie. We further award medical expenses of $4,495.45 to Cristin, $692.50 to Candace, and $453.00 to Cammie.

CONCLUSION
For the foregoing reasons, we reverse the judgment of the trial court and render judgment in favor of the Creels, finding that Slay was covered under the commercial general liability policy issued by LPCI to Ray's. We *448 further award Linda general damages of $750,000.00, past medical expenses of $163,846.00, future medical expenses of $20,000.00, and $347,645.00 for her loss of earning capacity. We award Michael general damages of $100,000.00, past medical expenses of $25,731.75, future medical expenses of $5,000.00, and past lost wages of $14,400.00. Finally, we award Cristin general damages of $5,000.00, and $2,500.00 each to Candace and Cammie, and past medical expenses of $4,495.45, $692.50, and $453.00 respectively. The costs of this appeal are assessed to the defendant-appellee, Louisiana Pest Control Insurance, Inc.
REVERSED AND RENDERED.

ON REHEARING
Rehearing is granted, and our original opinion is amended and the defendant, Louisiana Pest Control Insurance, Inc., (LPCI) is ordered to pay legal interest on defendant's policy limits of $500,000.00 from the date of judicial demand until August 5, 1998, the date of entry of the judgment of this court; after which defendant shall pay legal interest on the full amount of the judgment less a credit in the amount of $525,000.00, which was previously paid, until defendant pays its policy limits of $500,000.00, together with all legal interest, as set forth herein above.[1]
LPCI is further ordered to pay all costs of the trial court, to include the following fees for medical experts:

Dr. Douglas L. Gamburg $750.00
Dr. John S. McCabe 450.00
Dr. Riad Hajmurad 600.00
Dr. James Quillin 475.00
Dr. Gerald LeGlue 500.00
Dr. David Hilton 75.00
Dr. Michael Genoff 750.00
Dr. Babson Fresh 500.00

Finally, LPCI is ordered to pay $1,997.30 to M & S Court Reporters, Inc., for the costs of taking depositions; and $735.58 for the cost of certified copies of the hospital records which were offered into evidence. La.Code Civ.P. art. 1920; La.R.S. 13:4533; La.R.S. 13:3666(C).
NOTES
[1] 2. Exclusions.

This insurance does not apply to:
....
g. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."
[2] The plate and screws were removed from her ulna through surgery on July 11, 1994.
[1] We note that defendant's policy provides:

We will pay, with respect to any claim or "suit" we defend, as part of the limit of insurance shown in the Declarations:
....
7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.