682 S.E.2d 857

**AUTO–OWNERS INSURANCE COMPANY, Appellant,**

**v.**

**Samuel W. RHODES, Piedmont Promotions, Inc., and Marion L. Eadon d/b/a C & B Fabrications, C & B Fabrications, Inc., and Low Country Signs, Inc., Respondents.**

**No. 4605.**

Court of Appeals of South Carolina.

Heard June 10, 2009.

Decided Aug. 6, 2009.

Rehearing Denied Sept. 23, 2009.

84

88

A. Johnston Cox and John L. McCants, both of Columbia, for Appellant.

Creighton Coleman, of Winnsboro and Hoover C. Blanton and William O. Sweeny, both of Columbia, for Respondents.

HEARN, C.J.:

Auto–Owners Insurance Company appeals from the denial of its motion to vacate and/or stay this declaratory judgment action to determine coverage under an insurance policy, following this court's reversal and remand of the companion tort action for damages. In the alternative, Auto–Owners contends the circuit court erred in finding Marion Eadon d/b/a C & B Fabrication an insured under the policy, there was an occurrence resulting in property damage, and that none of the argued exclusions contained in the policy apply. We affirm as modified.

## FACTS/PROCEDURAL HISTORY

Marion Eadon is the sole owner and shareholder of the businesses C & B Fabrication, Inc. (C & B) and Lowcountry Signs, Inc. (Lowcountry), which both conducted business under the name C & B Fabrication. Samuel Rhodes is the sole owner and shareholder of Piedmont Promotions, Inc. (Piedmont), which owns or leases outdoor advertising space in various locations. In 1999, Rhodes entered into discussions with Eadon and C & B to design, fabricate, and erect three outdoor advertising signs on property owned by Rhodes that bordered Interstate 77 in Fairfield County, South Carolina. In addition, Rhodes obtained the necessary permits in the name of Piedmont with the South Carolina Department of Transportation (SCDOT) to erect the three signs. As a result of those discussions, C & B agreed to complete the signs for $153,960. Throughout the period of fabrication and installation of Rhodes' signs, C & B and Lowcountry held a Commercial General Liability Policy (the Policy) with Auto–Owners Insurance Company (Auto–Owners).

Approximately ten months following the installation of the signs, the middle sign was discovered to be leaning towards I–77. Rhodes contacted Eadon, informing him of the problem, and Eadon eventually sent a crew to address the issue. Three days after the crew visited the site, one of the other signs fell across I–77, blocking both lanes of southbound traffic. Rhodes immediately requested that Eadon remove all three signs; however, Eadon removed only the one that previously had been leaning, refusing to take down the sole remaining sign. SCDOT investigated the incident, requiring Rhodes to remove all the signs, and also revoked Piedmont's permits to maintain signs on the property in the future. Accordingly, Rhodes had the remaining sign removed.

Subsequently, Auto–Owners sent a reservation of rights letter to Eadon regarding the incident, stating it was unsure as to whether a claim existed under the Policy. Over the next few months, Auto–Owners paid several claims for damages caused by the fallen sign, but stated the Policy did not cover the majority of expenses that would be incurred following the loss. Thereafter, Rhodes and Piedmont brought suit (Tort action) against Eadon d/b/a C & B Fabrication, alleging damages to the real estate owned by Rhodes and lost income by Piedmont due to the negligent design, fabrication, and erection of the signs by C & B, which led to the destruction of the three signs and the loss of the SCDOT permits. While the Tort action was pending, Auto–Owners filed this declaratory judgment action (DJ action) against Rhodes, Piedmont Promotions, Eadon, and Lowcountry, to determine coverage provided under the Policy. Auto–Owners contended there had been no occurrence, as defined under the policy, or alternatively, that certain exclusions contained within the Policy avoided coverage. The complaint also sought a stay of the Tort action pending the resolution of the DJ action. It does not appear that this request for a stay was ever considered by the court, and, in fact, the DJ action was deferred pending the resolution of the Tort action.

The Tort action resulted in a jury verdict in Rhodes' favor for three million dollars in actual damages and three million five hundred thousand dollars in punitive damages. Following the verdict, Auto–Owners moved to continue the DJ action in order to obtain a copy of the Tort action transcript, which was

granted. Thereafter, all parties to the DJ action made motions for summary judgment. Auto–Owners also made a motion to amend its complaint, which was granted. In its amended complaint, Auto–Owners proposed changing its caption from "Marion L. Eadon d/b/a C & B Fabrications, Inc." to "Marion L. Eadon d/b/a C & B Fabrication," as well as contending in its pleadings for the first time that Eadon d/b/a C & B was not insured under its policy. The circuit court denied all motions for summary judgment.

The DJ action was set for a jury trial with respect to one issue; however, prior to the introduction of any evidence, the parties entered into a stipulation which, for the purposes of the DJ action only, reformed the named insureds on the Policy to reflect the fact that Eadon had insured several different companies under the Policy over its life, and each of the companies was understood to have done business under the name C & B Fabrication. The circuit court then decided the remaining issues before it non-jury, finding: there was an "occurrence" under the Policy that resulted in property damage to Rhodes; none of the argued exclusions applied; Eadon d/b/a C & B Fabrication was an insured under the Policy, and with the exception of the actual contractual cost of the three signs, the judgment rendered in the Tort action should be paid by Auto–Owners up to the Policy's limits; and postjudgment interest would accrue on the jury verdict until such time as Auto–Owners paid, offered to pay, or deposited a sum certain with the court.

While the litigation in the DJ action continued, and before the order of the circuit court referenced above was published, Eadon appealed the verdict in the Tort action to this court. In an unpublished opinion, the verdict was reversed based on the trial court's failure to grant Eadon's motion to transfer venue, and the matter was remanded for a new trial in Eadon's county of residence, Clarendon County. *Rhodes v. Eadon,* Op. No.2006–UP–413 (S.C. Ct.App. filed Dec. 15, 2006). In light of this development, Auto–Owners filed a supplemental Rule 59(e), SCRCP, motion,[1] and/or in the alter-

---

1. Prior to the reversal of the verdict in the Tort action, Auto–Owners had filed both an initial and an amended Rule 59(e) motion, as well as a motion for a new trial.

native, a Rule 60(b)(2), (4) and (5), SCRCP motion, contending that because the underlying verdict in the Tort action had been reversed by this court, the court's order in the DJ action was also null and void, based on the order's reliance on the evidence and testimony of the vacated action.

The circuit court took the matter under advisement, and thereafter issued a supplemental, and then a revised supplemental order. Based on this court's reversal of the Tort action, the circuit court granted Auto–Owners' motion in part, striking the portion of its order referencing the money damages awarded by the jury; however, the remaining portions of the order, including the determination that Eadon d/b/a C & B Fabrication was an insured, there was an occurrence, and that none of the exclusions applied, remained in full force and effect.[2] Auto–Owners now appeals this determination.

## STANDARD OF REVIEW

"A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Hardy v. Aiken*, 369 S.C. 160, 164–65, 631 S.E.2d 539, 541 (2006) (citations omitted). "When the purpose of the underlying dispute is to determine whether coverage exists under an insurance policy, the action is one at law." *Auto–Owners Ins. Co. v. Hamin*, 368 S.C. 536, 540, 629 S.E.2d 683, 685 (Ct.App.2006). "When reviewing an action at law, on appeal of a case tried without a jury, the appellate court's jurisdiction is limited to correction of errors at law." *Epworth Children's Home v. Beasley*, 365 S.C. 157, 164, 616 S.E.2d 710, 714 (2005). "[T]he appellate court will not disturb the trial court's findings of fact unless they are found to be without evidence that reasonably supports those findings." *Hamin*, 368 S.C. at 540, 629 S.E.2d at 685.

## LAW/ANALYSIS

### I. RULE 60(b)(2), (4), and (5), SCRCP, MOTION

Auto–Owners contends the circuit court erred in denying its post-trial motion under Rule 60(b)(2), (4), and (5), SCRCP, to

---

**2.** This court's unpublished reversal was later appealed to the supreme court, which denied certiorari.

both vacate its prior order and/or stay the case pending the resolution of the Tort action. Auto–Owners maintains that, because the underlying Tort action was reversed by this court, no duty to indemnify exists, and the retrial of the underlying action could produce a verdict for Auto–Owners, under which no duty to indemnify would exist. Auto–Owners further contends that, based on the only partial-vacation of the circuit court's order, there still exists repeated reliance on findings of the jury in the Tort action to support its rulings, which amounts to cause for relief under Rule 60. We disagree.

 A party seeking to set aside a judgment pursuant to Rule 60(b) has the burden of presenting evidence entitling him to the requested relief. *Bowers v. Bowers,* 304 S.C. 65, 67, 403 S.E.2d 127, 129 (Ct.App.1991). Whether to grant or deny a motion under Rule 60(b) is within the sound discretion of the trial court. *Coleman v. Dunlap,* 306 S.C. 491, 494, 413 S.E.2d 15, 17 (1992). On review, we are limited to determining whether the trial court abused its discretion in granting or denying such a motion. *Saro Invs. v. Ocean Holiday P'ship,* 314 S.C. 116, 124, 441 S.E.2d 835, 840 (Ct.App.1994).

Rule 60(b) states in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

... (4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

Rule 60(b)(2), (4), and (5).

 While there is authority elsewhere [3] that a DJ action is not ripe for adjudication until the underlying action

---

**3.** *See Certain Underwriters at Lloyd's, London v. Boeing Company,* 385 Ill.App.3d 23, 324 Ill.Dec. 225, 895 N.E.2d 940, 959 (2008) (an insurer's duty to indemnify was not ripe, because an actual controversy, e.g.

for damages has been resolved, this does not appear to be the law in South Carolina. In order to state a cause of action under the Uniform Declaratory Judgments Act,[4] a party must demonstrate a justiciable controversy. *Power v. McNair*, 255 S.C. 150, 154, 177 S.E.2d 551, 553 (1970). "A justiciable controversy is a real and substantial controversy which is appropriate for judicial determination, as distinguished from a dispute or difference of a contingent, hypothetical or abstract character." *Id.* "The Declaratory Judgments Act is a proper vehicle in which to bring a controversy before the court when there is an existing controversy or at least the ripening seeds of a controversy." *Sunset Cay, LLC v. City of Folly Beach*, 357 S.C. 414, 423, 593 S.E.2d 462, 466 (2004). In *Peoples Federal Savings & Loan Ass'n of South Carolina v. Resource Planning*, the supreme court affirmed a previous holding from this court to the effect that a case or controversy regarding the validity of a pre-emptive right does not accrue until the right has been asserted. 358 S.C. 460, 596 S.E.2d 51 (2004) (concurring in the result reached in *Webb v. Reames*, 326 S.C. 444, 485 S.E.2d 384 (Ct.App.1997)). Here, under the *Peoples Federal* court's reading of a justiciable controversy, a right has been asserted against Eadon and C & B, the alleged insureds under the Policy; therefore, this DJ action appears to be ripe for review.

Additionally, several South Carolina courts have tacitly approved the ripeness of a DJ action during the pendency of the underlying action for damages. In *Isle of Palms Pest Control Co. v. Monticello Insurance Co.*, this court discussed a general

---

a legal obligation to pay damages in the underlying action, did not yet exist). In addition, other courts have held that in order to eliminate the risk of inconsistent factual determinations that could prejudice *an insured*, a stay of a DJ action pending resolution of a third-party suit is appropriate when the coverage question turns on facts to be litigated in the underlying action. *See Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993); *Cal. Ins. Guarantee Ass'n v. Superior Court*, 231 Cal.App.3d 1617, 283 Cal.Rptr. 104 (1991); *Gen. of Am. Ins. Co. v. Lilly*, 258 Cal.App.2d 465, 65 Cal.Rptr. 750 (1968); *Constitution Assocs. v. N.H., Ins. Co.*, 930 P.2d 556 (Colo.1996); *Citizens Communications Co. v. Am. Home Assurance Co.*, 2004 WL 423059 (Me.Super.2004); *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995).

4. S.C.Code Ann. §§ 15–53–10 to –140 (Supp.2008).

liability policy in a DJ action, determining the insurance company had a duty to defend an underlying action, and that if the damages alleged in the complaint in the underlying action were proven, the insurance company had a duty to indemnify the insured. 319 S.C. 12, 14–20, 459 S.E.2d 318, 319–22 (Ct.App.1994).

Moreover, the supreme court was faced with a very similar procedural scenario in *Owners Insurance Co. v. Clayton,* when the underlying tort action was filed by a third party, and the insurer defended the insured under a full reservation of rights. 364 S.C. 555, 557, 614 S.E.2d 611, 612–13 (2005). Prior to the trial for damages, the insurer filed a DJ action to determine its liability under the policy. *Id.* at 557–58, 614 S.E.2d at 613. The underlying action was tried to a verdict, and the jury awarded the third party $1.25 million dollars. *Id.* While the DJ action was pending, the verdict was appealed and ultimately affirmed. The court in the DJ action found the insurer had a duty to indemnify the insured, and that order was both appealed and affirmed during the pendency of the appeal from the underlying jury award. *Id. Clayton* is illustrative of the approach this court should take in the case at bar. Although there is no indication that any party in *Clayton* requested a stay, or otherwise challenged the continued validity of the DJ action as not being ripe, the situation presented in *Clayton* is extremely similar to the situation presented here, with the exception that the underlying action was not reversed on appeal. While certiorari was still pending in the underlying action, the supreme court affirmed the insurer's duty to indemnify the insured; accordingly, we address the merits of this appeal, even in the absence of a specified damages award.[5]

5. This case is easily distinguishable from the situation faced by the supreme court in *Park v. Safeco Insurance Co. of America,* 251 S.C. 410, 162 S.E.2d 709 (1968). In *Park,* the supreme court held that a DJ action was not ripe for judicial pronouncement due to the lack of a justiciable controversy, when the third-party, injured plaintiff brought suit against the insurer prior to filing a legal complaint against the alleged at-fault insured. Finding the injured third party lacked the contractual privity to preemptively sue to establish the parties' liabilities under the insurance contract, the court found the insured must first become liable for damages before any rights vested in the injured party. The case before us is substantially different than *Park,* because here, the insured instituted this action after the Tort action complaint had been

Considerations of fairness and judicial economy also dictate that Auto–Owners' request to set aside or stay the judgment in the DJ action should be denied. It was Auto–Owners itself that filed this DJ action, and it was Auto–Owners that requested in its complaint that the Tort action be stayed pending resolution of this action. Auto–Owners obviously believed at that time that its DJ action could and should be resolved independent of what transpired in the Tort action. It would be a waste of judicial time and resources to set aside the judgment in the DJ action simply because the jury verdict in the Tort action was reversed and remanded. The propriety of the circuit court's resolution of the coverage issues can be addressed whether or not a judgment against Rhodes is in place. Accordingly, the circuit court's denial of Auto–Owners' Rule 60(b) motion is affirmed, and this court will review the substantive arguments Auto–Owners presents on appeal.

However, the continued inclusion of references to the Tort action jury, verdict, and damages in the circuit court's order is moot in view of the reversal of that verdict. We therefore vacate the portions of the order under "The Policy Provisions" section, referencing the Tort action.

## II. EADON d/b/a C & B'S STATUS AS AN INSURED UNDER THE POLICY

Auto–Owners contends the circuit court erred in concluding "Marion L. Eadon d/b/a C & B Fabrication" is an insured under the Policy. Auto–Owners alleges error in finding: Marion L. Eadon d/b/a C & B Fabrication is the same entity as C & B Fabricators, Inc. and Lowcountry Signs & Fabrication, Inc.; Eadon met the definition of an insured based on his actions being on behalf of the corporations listed on the policy; and Eadon reasonably expected to be covered for his actions regardless of what entity was actually listed as the named insured.

The circuit court found Eadon d/b/a C & B Fabrication is an insured under the Policy. The court based its conclusion on several factors. First, the court noted that, although the Policy was issued to Eadon and named the

---

filed, against both Eadon and Rhodes; therefore, an actual controversy exists, and the *Park* court's concerns over privity are not present.

insured as "C & B Fabrications Inc. & Low Country Signs Inc.," neither of those two companies actually existed at the time the Policy was issued. Instead, the two companies, C & B Fabricators, Inc. and Lowcountry Signs & Fabrication, Inc., were chartered by Eadon, and in the stipulation entered into by the parties to this DJ action, the Policy was reformed to reflect the fact that these two companies were the named insured under the Policy, and they both did business under the trade name, C & B Fabrication. Additionally, Eadon was sued in the underlying Tort action as doing business under the same name, C & B Fabrication. Thus, the circuit court determined, it was the belief of all the parties privy to the Policy that it would serve as coverage for the sign-making business conducted by C & B and by Eadon.

The Policy sets out who is considered an insured under Section II:

Who is an insured

1. If you are designated in the Declarations as:

c. An organization other than a partnership or joint venture, you are insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors.

The circuit court found the foregoing provision controlling, as C & B Fabrication was listed under the Policy as a corporation. Moreover, based on the testimony, evidence, and pleadings presented at trial, it was established that Eadon d/b/a C & B Fabrication served as the contact person for the contract with Rhodes and Piedmont for the fabrication, delivery and installation of the three outdoor billboard signs. Eadon also served as the conduit for acquiring the necessary insurance coverage for C & B. Based on this evidence the circuit court found that coverage applied to Eadon under Section 1.c. of the Policy, because his dealings with Rhodes and Piedmont were conducted with respect to his duties as an officer of the company.

Auto–Owners' contention centers around its argument that Eadon fails to meet the definition of an insured under the contract because none of the activities for which he was sued in the Tort action fall within his duties as an officer of the corporation. Auto–Owners relies on several cases from other

jurisdictions to support this argument, primarily *Creel v. Louisiana Pest Control Insurance, Inc.*, 723 So.2d 440 (La. App. 3 Cir.1998). In *Creel*, the Louisiana court found that under the plain meaning of the policy, "an executive officer is precluded from being an employee and, thus, an insured except when performing his executive duties." *Id.* at 443. Because the facts leading to the action involved an accident that occurred when the executive in question was en route to spray a house for insects and pests, the *Creel* court found he was not performing his duties as an "executive" when the accident occurred, thus the language of the policy excluded his coverage under any duties he conducted as an "employee." *Id.* Auto–Owners argues we should infer a similar result here because the allegations contained in the Tort action related only to the negligent fabrication and installation of the billboard signs, with which Eadon did not participate.

In order to reach a similar result, this court would have to find, for what appears to be the first time in South Carolina, that the duties of an officer and those of an employee, as delineated by a general commercial liability policy, are mutually exclusive. We decline to make that distinction the law in South Carolina. As a natural by-product of any contention regarding the activities that Eadon undertook, Auto–Owners additionally maintains Rhodes and Piedmont should be judicially estopped from arguing that coverage under the Policy should be applied to Eadon because he was acting on behalf of the corporation. In the Tort action, Rhodes sued Eadon as an individual, and was in the first instance successful, arguing that Eadon should be liable for negligence because he was *not* acting on behalf of the corporation in contracting for the signs. Auto–Owners maintains that Rhodes should be estopped from now arguing the exact opposite to this court. However, Auto–Owners' contention fails the fourth element of the test[6] for judicial estoppel: the inconsis-

---

6. The elements of judicial estoppel include: (1) two inconsistent positions taken by the same party or parties in privity with one another; (2) the positions must be taken in the same or related proceedings involving the same party or parties in privity with each other; (3) the party taking the position must have been successful in maintaining that position and have received some benefit; (4) the inconsistency must be part of an intentional effort to mislead the court; and (5) the two

tency must be part of an intentional effort to mislead the court. While it is true that during the Tort action against Eadon, Rhodes argued Eadon had acted in an individual capacity, in this DJ action, Rhodes is a party only by virtue of having been included by Auto–Owners, and is not in privity with either party under the Policy at issue. While we are mindful of the implications a decision that Eadon is an insured under the Policy could have on Rhodes' case in the retrial of the Tort action, such implications may not influence our analysis of the legal issues before us. Instead, we are required to answer the questions before us based on the facts alleged. Therefore, insofar as Eadon's responsibilities involved him in the procurement of the contract with Rhodes and Piedmont, or the commercial general liability policy with Auto–Owners, we hold he was an insured under the Policy.

Auto–Owners also contends the circuit court erred in applying the reasonable expectations doctrine, because it has been rejected and generally discredited as a basis for interpreting a contract that is found to be ambiguous. A close reading of the circuit court's opinion reveals several instances where it refers to the expectations of both parties; however, the order goes on to clearly state that any potential ambiguity arising from the confusion of the corporations and trade names of the parties involved in the litigation was resolved with the parties' stipulation prior to the case's submission to the court. The court's order clearly finds coverage based on Eadon's actions as a director of the corporation. As a result, Auto–Owners' contention is without merit, and coverage under the policy was not based on the reasonable expectations of the parties.

## III. EXISTENCE OF AN OCCURRENCE

Auto–Owners contends the circuit court erred in finding an occurrence took place, as defined under the Policy, because the alleged damage sustained was only to the fabricated signs as a result of the insured's own faulty workmanship.

The Policy in this case reads, in pertinent part:

Coverage A. Bodily Injury and Property Damage Liability

 1. Insuring Agreement

---

positions must be totally inconsistent. *Cothran v. Brown*, 357 S.C. 210, 215–16, 592 S.E.2d 629, 632 (2004).

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

. . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

. . .

Section V—Definitions

. . .

9. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . .

12. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

An occurrence, as described above, means an accident, although that term is not specifically defined in the Policy; however, the term has been defined by the supreme court in a case concerning an identical commercial general liability policy as "[a]n unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt." *Green v. United Ins. Co. of America*, 254 S.C. 202, 206, 174 S.E.2d 400, 402 (1970).

The circuit court found there was an occurrence, distinguishing the case of *L–J v. Bituminous Fire & Marine Insurance Co.*, 366 S.C. 117, 621 S.E.2d 33 (2005). In *L–J*, the supreme court found the alleged damage did not constitute property damage under a similar commercial general liability

policy, because the claim was merely one for faulty workmanship that resulted in damages to the work product alone. *Id.* at 123, 621 S.E.2d at 36. However, the supreme court did note that a commercial general liability policy could provide coverage when a claim for faulty workmanship alleged third party bodily injury or damage to other property. *Id.* n. 4.

The *L–J* court examined the case of *High Country Associates v. New Hampshire Insurance Co.*, in which a condominium homeowners' association sued the condominium builder seeking damages due to the negligent construction of the buildings. 139 N.H. 39, 648 A.2d 474 (1994). The *High Country* case dealt with the alleged continuous moisture intrusion from a subcontractor's defective installation of siding resulting in moisture seeping into the buildings, which caused pervasive decay of the interior and exterior walls and loss of structural integrity of the condos. *Id.* at 476. The *High Country* court found the claim under a similar commercial general liability policy was not simply one for damages resulting from faulty workmanship, but rather, was a claim for negligent construction resulting in property damage to the other property. *Id.* at 477. This amounted to an occurrence for which coverage would be provided. *Id.* at 478.

Finding a parallel between the facts in this case and those present in *High Country*, the circuit court found the damage alleged by Rhodes to not merely be damages sustained to the work product alone, due to faulty workmanship, but also to the "other property" of Rhodes. We find the circuit court's analysis of the alleged damages to Rhodes' property to be a proper extension of the supreme court's notation in *L–J* of the potential for recovery under facts similar to *High Country*.[7] As a result, the circuit court's finding that the damages were a result of the unexpected

---

7. We note the supreme court has considered a case with facts similar to those in *High Country*, in *Auto–Owners Insurance Co. v. Newman*, Op. No. 26450 (S.C. filed March 10, 2008), reaching the same result as the circuit court in this case. However, although an opinion in *Newman* was issued, rehearing was subsequently granted by the court, and after arguments were held November 8, 2008, no substitute opinion has been published to date. Therefore, while the previously-released opinion is favorable to the result reached by the circuit court, we did not rely on it for considerations of this appeal.

happening of the sign falling, thus constituting an occurrence under the Policy, is upheld.

## IV. FALLING OF THE SIGN CREATED PROPERTY DAMAGE

Auto–Owners contends the property damages found by the circuit court did not comport with the definition of "property damage" in the policy. Auto–Owners also maintains that any alleged damage stemming from Rhodes' inability to reinstall signs on the property should be excluded because the evidence introduced in the Tort action is that SCDOT's refusal to reissue the necessary licenses resulted from its determination that Rhodes was conducting a sham business.

As previously described above, the Policy provides that property damage is defined as:

12. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

Auto–Owners contends the circuit court erred in failing to apply the principles of *Braswell v. Faircloth*, 300 S.C. 338, 387 S.E.2d 707 (Ct.App.1989) to this case. In *Braswell*, an insured lessee left hazardous waste on the lessor's property when it vacated the premises. *Id.* at 339, 387 S.E.2d at 708. The corrosive chemicals that were left ate through the valve of the storage tank that held them, releasing 1000 gallons of chemicals into an adjacent field. *Id.* at 340, 387 S.E.2d at 708. DHEC issued an order requiring the lessor to clean up the property, and thereafter, when the lessor sued the lessee, the insurer defended and denied coverage. *Id.* at 340–41, 387 S.E.2d at 708. Affirming in part the grant of summary judgment in favor of the insurer, this court found an occurrence under the policy, but determined that any "damages" attributable to the costs of removing the stored wastes and chemicals that had not yet leaked were not recoverable, since no property damage had yet resulted. *Id.* at 345, 387 S.E.2d

at 711. This court relied upon two Fourth Circuit cases for its holding: the first held that an insurer was not obligated to indemnify an insured under a commercial general liability policy when the underlying action was a suit by the federal government to seek compliance with the directives of regulatory agencies. *Maryland Cas. Co. v. Armco Inc.*, 822 F.2d 1348 (4th Cir.1987). The second held that an insurer was not obligated to indemnify its insured in a suit to recover the response costs of removing hazardous wastes. *Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979 (4th Cir.1988).

However, the holding in *Braswell* has since been modified by the supreme court, which specifically rejected the reasoning of *Armco* and *Milliken*. *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 357 S.C. 631, 594 S.E.2d 455 (2004). In *Helena*, a business involved in the agricultural chemicals market was required by the Environmental Protection Agency (EPA) and State Department of Health and Environmental Control (DHEC) to clean up three sites that had been contaminated. *Id.* at 634, 594 S.E.2d at 456. Thereafter, the business sought reimbursement from its insurance company for the cost of the clean-up required by the EPA and DHEC; however, the trial court granted insurers summary judgment on the claims. *Id.* at 635, 594 S.E.2d at 457.

In reversing the trial court on appeal, the supreme court rejected the reasoning found in the *Armco* and *Milliken* cases that the clean-up costs were not "damages" as defined by the insurance policy. *Id.* at 638–41, 594 S.E.2d at 458–60. The supreme court found the fourth circuit cases too narrowly construed the term damages within an insurance contract. Instead, the *Helena* court cited to a Maryland case which had also rejected the reasoning of the fourth circuit cases, finding "the insurer's pledge to pay damages will apply generally to compensatory outlays of various kinds, including expenditures made to comply with administrative orders or formal injunctions." *Id.* at 638, 594 S.E.2d at 458 (quoting *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (1993)). The circuit court analogized the insurer's duty to pay expenditures having to do with environmental clean-ups to the case at hand, wherein SCDOT deemed the remaining two signs unsafe, and required Rhodes to take them down. We find the circuit court's analysis of *Helena* to be accurate, and, therefore, the cost associated with Rhodes' required removal of the

final sign comports with the broader definition of damages or physical injury to tangible property defined in subsection 12.a.

The circuit court also found the diminution in value of Rhodes' property attributable to the loss of his permits to erect signs in the future, fit within the second part of the definition of property damage: loss of use of tangible property. Thus, the Policy would provide coverage for lost profits from the inability to maintain signs on the property and contributing to its overall diminution in value. Furthermore, the current law of this state appears to be that a commercial general liability policy is intended to provide coverage for tort liability for physical damage to property of others, but not for the insured's contractual liability which causes economic losses. *See Century Indem. Co. v. Golden Hills Builders, Inc.,* 348 S.C. 559, 566, 561 S.E.2d 355, 358 (2002) (citing *Isle of Palms Pest Control Co. v. Monticello Ins. Co.,* 319 S.C. 12, 459 S.E.2d 318 (Ct.App.1994), *aff'd,* 321 S.C. 310, 468 S.E.2d 304 (1996)).

Auto–Owners, meanwhile, contends the circuit court ignored the evidence it presented that the reason Rhodes could not reinstall the signs on his property was not that SCDOT found them to be unsafe, but rather because Rhodes was conducting a sham business. *See Rhodes v. Eadon,* Op. No. 2006–UP–413 (S.C. Ct.App. filed Dec. 15, 2006) (detailing in the Facts portion of the opinion that Rhodes' application to SCDOT for new permits was denied because the Interstate was not a qualifying commercial business, but was being operated as a sham. Rhodes appealed the denial to the Administrative Law Court, which affirmed SCDOT's finding of a sham activity). However, this information and argument does not negate the existence of evidence of property damages under the Policy, requiring our affirmance of the circuit court under our standard of review on appeal. Rather, the evidence that Rhodes' application for a new license was denied as a sham is evidence that should be introduced and properly weighed by the jury in the retrial of the Tort action.

## V. APPLICATION OF EXCLUSIONS FOUND IN THE POLICY

Finally, Auto–Owners contends the circuit court erred in finding none of exclusions k, l, m, and n applicable to preclude coverage under the Policy. We disagree.

"Rules of construction require clauses of exclusion to be narrowly interpreted, and clauses of inclusion to be broadly construed." *Laidlaw Env. Serv. (TOC) v. Aetna Cas. & Sur. Co. of Ill.*, 338 S.C. 43, 47, 524 S.E.2d 847, 849 (Ct.App.1999) (quoting *McPherson v. Mich. Mut. Ins. Co.*, 310 S.C. 316, 319, 426 S.E.2d 770, 771 (1993)).

The Policy provides:

2. Exclusions

This insurance does not apply to:

. . .

k. "Property damage" to "your product" arising out of it or any part of it.

l. "Property damage" to "your work" arising out of it or any part of it and including [sic] in the "products-completed operations hazard."

. . .

m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, or removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

. . .

Section V—Definitions

. . .

5. "Impaired Property" means tangible property other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work";

. . .

11.a. "Products-completed operations hazard"

Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

b. "Your work" will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

. . .

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

14. "Your product" means:

a. Any good or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You

(2) Others trading under your name; or

. . .

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"

. . .

15. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"

. . .

■■■ Auto–Owners first contends that, although the circuit court was correct in excluding the contractual price of the signs, it erred in failing to find Exclusion k prohibits damages resulting from the loss of use of the signs. The circuit court properly analyzed Exclusion k and determined that the majority, if not all, of the damages assigned by the jury in the Tort action corresponded to the damages inflicted on Rhodes' business, rather than the actual work product—the signs—of C & B, which was properly excluded. We find evidence supports this determination.

■■■ Auto–Owners next assigns error to the circuit court's analysis of Exclusion l, which again addresses the "property damage" or "your work", but does so in the context of a "products-completed operations hazard." The circuit court discussed the case *Kennedy v. Columbia Lumber & Manufacturing. Co.*, 299 S.C. 335, 384 S.E.2d 730 (1989), in the context of when a builder has violated a legal duty under a negligence action. The supreme court in *Kennedy* stated:

A builder may be liable to a home buyer in tort despite the fact the buyer suffered only "economic losses" where: (1) the builder has violated an applicable building code; (2) the builder has deviated from industry standards; (3) the builder has constructed housing that he knows or should know will pose serious risks of physical harm.

108

*Id.* at 346–47, 384 S.E.2d at 737–38; *see also Colleton Preparatory Academy, Inc. v. Hoover Universal, Inc.,* 379 S.C. 181, 666 S.E.2d 247 (2008) (discussing the exception to the economic loss rule in the context of a home buyer). Based on the evidence and testimony provided at trial, the circuit court determined Eadon violated all three of these conditions. The circuit court was correct in its determination that Exclusion l does not apply, as the "products-completed operations hazard" cannot serve as a broadly written catch-all exclusion that would prohibit recovery no matter what consequences "arise out of" the product of the insured.

▇▇▇ Auto–Owners next contends the circuit court erred in finding Exclusion m does not apply. Exclusion m expressly states that: "[t]his exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use." The circuit court found, and we agree, that a sudden and accidental physical injury to Eadon's product is precisely what precipitated the events that led to the filing of this DJ action. Therefore, the caveat provided in the Policy itself prevents the applicability of Exclusion m under the facts of this case.

▇▇▇ Finally, Auto–Owners contends the circuit court erred in failing to apply Exclusion n. As discussed by the circuit court, exclusions like n are commonly referred to as "sistership" exclusions. These exclusions are typically included and applied to shield insurers from liability for the costs associated with unanticipated product recalls, and do not apply to claims involving losses resulting from the failure of the insured's product or work, when there is no evidence of a general recall of similar products or materials from the market place. *See Erie Ins. Exchange v. Colony Dev. Corp.,* 136 Ohio App.3d 406, 736 N.E.2d 941 (1999); *Standard Fire Ins. Co. v. Chester—O'Donley & Assocs., Inc.,* 972 S.W.2d 1 (Tenn.Ct.App. 1998). The circumstances giving rise to the Tort action, without question, did not involve a product recall; therefore, the circuit court did not err in finding Exclusion n inapplicable to this case.

## CONCLUSION[8]

We find it appropriate, in the interest of judicial economy and fairness, as well as the previous positions taken by parties to this action, for this court to reach the merits of this DJ action, rather than to stay the case pending the retrial of the Tort action. However, as noted above, we vacate the portions of the circuit court's order, under "The Policy Provisions" section, referencing the former verdict in the Tort action. On the merits, we find the circuit court was correct in its determination that: Eadon d/b/a C & B Fabrication was an insured under the Policy; there was an occurrence resulting in damages; and that none of the exclusions in the Policy apply. As a result, the decision of the circuit court is

**AFFIRMED AS MODIFIED.**

KONDUROS, J., and JONES, A.A.J., concur.

---

8. Auto–Owners also presents several additional bases of error by the circuit court. First, Auto–Owners contends the circuit court erred in relying on findings of facts unsupported by the record before it; specifically, where the order is inconsistent with the transcript of the Tort action. This argument is without merit because the circuit court, as trier of fact in an action without a jury, is entitled to make its own findings of fact. *Epworth*, 365 S.C. at 164, 616 S.E.2d at 714 ("When reviewing an action at law, on appeal of a case tried without a jury, the appellate court's jurisdiction is limited to correction of errors at law."). Second, Auto–Owners contends the circuit court erred in finding C & B is entitled to payment from Auto–Owners for the expense it incurred in the removal of the final sign left standing. As discussed above, *Helena* is instructive as to whether the costs of taking down the third sign, in order to comply with SCDOT's mandate, falls under the ambit of the plain and ordinary definition of the word damages. 357 S.C. 631, 594 S.E.2d 455 (2004). Under our standard of review, there exists evidence in the record to support the circuit court's determination on this matter; therefore we will not set aside this finding on appeal. *See Hamin*, 368 S.C. at 540, 629 S.E.2d at 685 ("[T]he appellate court will not disturb the trial court's findings of fact unless they are found to be without evidence that reasonably supports those findings."). Moreover, although Auto–Owners states neither Eadon nor C & B pursued a claim for reimbursement in the DJ action, Eadon and C & B's amended answer and counterclaim specifically prays for the costs incurred by the Respondents in rectifying the consequential damages caused by the removal of the signs.