594 S.E.2d 455

### HELENA CHEMICAL COMPANY, Appellant,

v.

### ALLIANZ UNDERWRITERS INSURANCE COMPANY, CIGNA Property and Casualty Insurance Company, Insurance Company of North America, Lexington Insurance Company, Lloyd's of London, Maryland Casualty Company, The Central National Insurance Company of Omaha, The Home Insurance Company, and United States Fire Insurance Company, Defendants,

**Of Whom Lexington Insurance Company, Lloyd's of London, and The Home Insurance Company are Respondents.**

No. 25797.

Supreme Court of South Carolina.

Heard April 23, 2003.

Decided March 22, 2004.

632

William B. Harvey, III, of Harvey & Battey, P.A., of Beaufort; and Kim K. Burke, of Taft, Stettinius & Hollister LLP, of Cincinnati, OH, for Appellant.

A. Camden Lewis and Mary G. Lewis, both of Lewis, Babcock & Hawkins, L.L.P., of Columbia; Ellis B. Drew, III, of Wells Jenkins Lucan & Jenkins, of Winston-Salem, NC; Jay Russell Sever, of Phelps Dunbar, LLP, of New Orleans, LA; Michael P. Horger, of Horger & Horger, of Orangeburg; Richard Kuhl and Robert N. Kelly, both of Jackson & Campbell, P.C., of Washington, DC; and Thomas C. Salane, of

Turner, Padget, Graham & Laney, of Columbia, for Respondents.

Andrea C. Pope, of Barnes, Alford, Stork & Johnson, L.L.P., of Columbia; Laura A. Foggan, John C. Yang, and Kimberly M. Hrabosky, all of Wiley Rein & Fielding, LLP, of Washington, DC, for Amicus Curiae Insurance Environmental Litigation Association.

William B. Harvey, III, of Harvey & Battey, P.A., of Beaufort; Howard T. Weir, III, of Morgan Lewis & Bockius LLP, of Washington, DC; John E. Failla and Seth D. Amera, both of Morgan Lewis & Bockius LLP, of New York, NY, for Amicus Curiae Federal Pacific Electric Company.

Chief Justice TOAL:

This is an insurance coverage case in which appellant Helena Chemical Company (Helena) seeks, among other things, indemnification from its various primary and excess insurers for environmental cleanup costs. The trial court granted summary judgment for the insurers, and Helena appeals. We affirm in part and reverse in part.

## FACTUAL/PROCEDURAL BACKGROUND

Helena is in the business of formulating, distributing, and selling agricultural chemicals, including pesticides, to the farming industry.[1]  Helena began its South Carolina operations in 1970 when it merged with Blue Chemical Company. At issue in the instant case are three of Helena's South Carolina sites—Fairfax, Cameron, and Mayesville—where, in conjunction with the Environmental Protection Agency (EPA) and the South Carolina Department of Health and Environmental Control (DHEC), Helena conducted extensive cleanups of polluted soil.

The majority of the costs Helena is seeking relate to the Fairfax site.  In December 1988, the EPA advised Helena in a letter that it considered Helena a "potentially responsible party" (PRP) for pollution at the Fairfax site.  The EPA told Helena that pursuant to the Comprehensive Environmental

---

1. Pesticide formulation consists of mixing a product with agricultural chemicals in order to get the desired concentration.  Helena formulates both dry and liquid pesticides.

Response, Compensation and Liability Act of 1980 (CERC-LA), it was "considering spending public funds to respond to the release and threatened release of hazardous substances and contaminated materials" at the Fairfax site, unless such action would be done "properly by a responsible party." The letter encouraged Helena to "undertake voluntary cleanup activities" and invited Helena to commence "formal negotiations" with the agency.

In response to the letter, Helena entered into an agreement with the EPA and conducted a Remedial Investigation/Feasibility Study (RI/FS). The RI/FS revealed that there was significant environmental damage to the soil, and Helena conducted a major removal and off-site disposal action of pesticide-contaminated soil. In its complaint, Helena sought legal defense costs and over $8 million for "responding to and addressing" the claims made by the EPA and DHEC.

With regard to pollution at Helena's Cameron site, DHEC informed Helena in 1994 that it considered Helena to be a "potentially responsible party" (PRP) under CERCLA. Although Helena did not enter into any formal agreement, it did conduct a removal of pesticide-contaminated soil at the Cameron site, incurring over $1 million in costs.

With regard to pollution at Helena's Mayesville site, DHEC notified Helena in 1995 that it had found pesticide contamination, and Helena conducted a cleanup there as well.

The insurers denied Helena coverage for the monies expended for the cleanups. Helena instituted this declaratory judgment action seeking reimbursement for all costs incurred. The trial court granted summary judgment in the insurers' favor. Specifically, the trial court found there was no insurance coverage because: (1) Helena's cleanup costs were not "damages" and (2) Helena's claims fell under the insurance policies' pollution exclusion. Additionally, the trial court granted summary judgment on Helena's bad faith claims, holding that the insurers had a reasonable basis to deny coverage.

Helena now appeals, asking this Court to consider the following issues:

I.   Did the trial court err in finding that the costs incurred by Helena were not "damages" within the meaning of the insurance policies?

II.  Did the trial court err in finding that the pollution releases were not "sudden and accidental," and therefore Helena's claims were barred under the policies' pollution exclusion?

III. Did the trial court err in granting summary judgment on Helena's bad faith claims?

## LAW/ANALYSIS

### I.   "DAMAGES"

Each insurance policy issued to Helena specifies that the insurer will pay the insured for all sums the insured is "legally obligated to pay" as "damages" because of property damage.[2] Helena argues the trial court erred when it decided as a matter of law that the environmental cleanup costs did not qualify as "damages." We agree.

The trial court found that the plain, ordinary, and popular meaning of the term "damages" does not include environmental cleanup costs because these costs are not sums payable to a third party as a result of a lawsuit brought by that party. The trial court relied primarily on two Fourth Circuit cases: *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir. 1987) and *Cincinnati Ins. Co. v. Milliken and Co.*, 857 F.2d 979 (4th Cir.1988).

In *Armco*, the Fourth Circuit was predicting Maryland law. The *Armco* court noted Maryland's rule of construction for insurance contracts that the policy terms should be given their ordinary meaning. *Armco*, 822 F.2d at 1352. Nonetheless, the court held that the term " 'damages' is to be construed in consonance with its 'accepted **technical** meaning in law.' " *Id.* (emphasis added, citation omitted). The court explained there was a difference between legal and equitable damages, and this technical meaning of "damages" encompassed only legal damages, i.e., payments to a third party who has a legal claim for damages. *Id.* (citation omitted).

---

**2.** Although the exact language in the policies differs somewhat, this is essentially how the policies define general coverage.

The underlying lawsuit in *Armco* was an action brought by the United States against Armco for reimbursement of remedial costs and injunctive relief in connection with the cleanup of a hazardous waste site. Because the relief sought by the United States was equitable and remedial in nature, the *Armco* court held there was no insurance coverage: "The general comprehensive liability policy . . . covers 'damages,' but not the expenditures which result from complying with the directives of regulatory agencies." *Id.* The court noted that if "damages" were given a broad meaning, then the term "damages" in the contract "would become mere surplusage, because any obligation to pay would be covered." *Id.*

In *Milliken*, the Fourth Circuit applied **South Carolina** law and followed *Armco's* reasoning:

> We perceive no material distinctions between the South Carolina and Maryland laws in the construction and interpretation of insurance policies that should cause us to deviate from *Armco* . . . . Absent ambiguity, in South Carolina the language of an insurance policy is given its plain, ordinary, and popular meaning. . . . In the insurance context the word "damages" is not ambiguous. It means legal damages. . . . We have no doubt that South Carolina law, in concert with Maryland and Missouri, would recognize that a general comprehensive liability policy which obligated the insurer to pay "all sums which the insured shall become legally obligated to pay as damages" would not cover claims for which the insured is equitably obligated to pay.

857 F.2d at 980–81 (citations omitted).

But when faced with the same issue presented in the instant case, the highest state court in Maryland flatly **rejected** the reasoning and holding of *Armco*. *See Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (1993). The *Bausch & Lomb* court held that the ordinary and accepted meaning of damages was not a narrow, technical one, but instead was a broad one, encompassing environmental response costs, even when those costs are incurred **without** a government directive. The Maryland court stated as follows:

> To the extent it suggests that the term "damages" imports a distinctively legal meaning in insurance matters, *Armco* misperceives the law of Maryland. . . . [W]e accord to words

their usual and accepted signification. "Damages" in common usage means the reparation in money for a detriment or injury sustained. The reasonably prudent layperson does not cut nice distinctions between the remedies offered at law and in equity. Absent an express provision in the document itself, insurance policy-holders surely do not anticipate that coverage will depend on the mode of relief, i.e. a cash payment rather than an injunction, sought by an injured party. Policy-holders will, instead, reasonably infer that the insurer's pledge to pay damages will apply generally to compensatory outlays of various kinds, including expenditures made to comply with administrative orders or formal injunctions. The ordinary person understands "damages" as meaning money paid to make good an insured loss.... In this context, environmental response costs fall within that definition.

*Id.* at 1032–33 (footnote omitted).

We agree with the reasoning of the *Bausch & Lomb* court. As that court pointed out, the Fourth Circuit's logic contains an inherent paradox: although insurance policy terms are to be construed in their ordinary and usual way, the *Armco* and *Milliken* courts both accorded the term "damages" a narrow, technical meaning. This goes against South Carolina precedent which holds that this Court must give policy language its plain, ordinary, and popular meaning. *E.g., Century Indem. Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 565, 561 S.E.2d 355, 358 (2002).

■■■■ The plain, ordinary meaning of "damages" is monies paid on an insured's loss, in this case, from property damage. An "ordinary" meaning of the term is not a legalistic one dependent on whether the damages are classified as legal versus equitable. *See, e.g., Bausch & Lomb*, 625 A.2d at 1033; *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991) ("The policy language, 'all sums which the insured shall become legally obligated to pay as damages because of property damage,' can reasonably be interpreted to cover any claim asserted against the insured arising out of property damage, which requires the expenditure of money, regardless of whether the claim can be characterized as legal or equitable in nature."); *Farmland Indus., Inc. v. Republic*

*Ins. Co.,* 941 S.W.2d 505, 510 (Mo.1997) ("To give words in an insurance contract a technical meaning simply by reading them 'in the insurance context,' would render meaningless our law's requirement that words be given their ordinary meaning unless a technical meaning is plainly intended.").

We note further that there is a split of authority over whether environmental cleanup costs constitute "damages" under an insurance policy. The majority of state courts have held that there is coverage for these costs. *See, e.g., Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d at 622; *Bausch & Lomb,* 625 A.2d at 1033; *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175 (Minn.1990); *Farmland Indus., Inc. v. Republic Ins. Co.,* 941 S.W.2d at 509; *Coakley v. Maine Bonding and Cas. Co.,* 136 N.H. 402, 618 A.2d 777 (*N.H.*1992); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.,* 326 N.C. 133, 388 S.E.2d 557 (1990); *Boeing Co. v. Aetna Cas. and Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507 (1990). *But see Certain Underwriters at Lloyd's of London v. Superior Court,* 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, 106 (2001); *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16 (Me.1990).

■ Moreover, the fact that "different courts have construed the language of an insurance policy differently is some indication of ambiguity." *Greenville County v. Ins. Reserve Fund,* 313 S.C. 546, 548, 443 S.E.2d 552, 553 (1994). Where the words of an insurance policy are capable of two reasonable interpretations, the construction most favorable to the insured should be adopted. *Id.* at 547–48, 443 S.E.2d at 553 (citations omitted). Therefore, the split of authority amongst the other courts that have addressed this issue militates in favor of a finding of ambiguity and an interpretation in favor of the insured. *Id.; accord A.Y. McDonald Indus.,* 475 N.W.2d at 619 (viewing the term "damages" as ambiguous and holding that "the ordinary meaning of 'damages' is broad enough to include government mandated response or cleanup costs under CERCLA and similar state environmental protection statutes"); *C.D. Spangler Constr. Co. v. Indus. Crankshaft and Eng'g Co.,* 388 S.E.2d at 569 (finding that "damages" is capable of "several reasonable interpretations" and concluding

that "a 'reasonable person in the position of the insured' may have understood that the term 'damages' included state-ordered environmental cleanup costs").

Nonetheless, in the present case, the insurers argue that the trial court's ruling is correct pursuant to the Court of Appeals' opinion in *Braswell v. Faircloth*, 300 S.C. 338, 387 S.E.2d 707 (Ct.App.1989). *Braswell*, however, does not support the insurers' argument. In *Braswell*, a lessee of property (the insured) left hazardous waste on the lessor's property. The corrosive chemicals left by the insured ate through a valve on one of the storage tanks and 1000 gallons of chemicals spilled onto a field adjacent to the tank. DHEC later issued an administrative consent order requiring the cleanup of the property. When the lessor sued the insured, the insurer denied coverage. The trial court granted summary judgment in favor of the insurer, finding neither an 'occurrence' nor 'property damage.'

The Court of Appeals reversed in part, finding the chemical spill constituted an 'occurrence,' and therefore the cleanup costs associated with the spill should be covered by the insurer. But because most of the costs were for removal of stored wastes that had not leaked, the Court of Appeals held these costs were not recoverable since no property damage had yet resulted. In making this holding, the Court of Appeals cited both *Armco* and *Milliken*, apparently approving of these cases. The court's holding, however, clearly rested upon a finding that there was no 'property damage,' not on an interpretation of the term 'damages.' For this reason, the *Braswell* court's reliance on the Fourth Circuit cases was misplaced.[3]

---

3. Further, despite the seemingly positive treatment of *Armco* and *Milliken*, *Braswell* ultimately allowed insurance coverage for environmental cleanup costs where property damage had occurred. Thus, it is questionable whether *Braswell* actually applied the holdings of *Armco* and *Milliken*. Indeed, in a recent Fourth Circuit case, a concurring judge has made this same observation. *See Ellett Brothers, Inc. v. United States Fidelity & Guar. Co.*, 275 F.3d 384, 389 (4th Cir.2001) (Michael, J., concurring), *cert. denied*, 537 U.S. 818, 123 S.Ct. 94, 154 L.Ed.2d 24 (2002) (where Judge Michael stated that "the ultimate holding in *Braswell* appears to conflict with *Milliken's* legal/equitable distinction"). We agree with Judge Michael that *Braswell* actually rejected *Milliken's* "categorical rule excluding equitable relief from the

For all of the above reasons, we find the trial court erred in ruling that Helena's environmental cleanup costs were not "damages" contemplated under the insurance policies. We specifically reject the reasoning of *Armco* and *Milliken*, and instead, align South Carolina with the majority of jurisdictions that have allowed insurance coverage for this type of loss, provided that an exclusion does not apply.

## II. POLLUTION EXCLUSION

■ Next, Helena argues the trial court erred in finding the pollution exclusion in the insurance policies barred Helena's claims. Helena contends there is a genuine issue of material fact that precludes summary judgment on this issue. We disagree.

All of the insurance policies contain a pollution exclusion, which states that coverage does not apply to:

property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; **but this exclusion does not apply if such discharge, release or escape is sudden and accidental.**

(emphasis added).[4] Accordingly, property damage caused by pollution arising from ordinary business operations is not covered. But if the damage were caused by a "sudden and accidental" discharge, release, or escape of pollutants, then the insurers must provide coverage.

In *Greenville County v. Ins. Reserve Fund*, 313 S.C. 546, 443 S.E.2d 552 (1994), this Court specifically held that the term "sudden" is to be interpreted as "unexpected." Consequently, we must determine whether the discharge, release, or escape of the pesticide was unexpected and accidental.

term 'damages.' " *Id.* at 390. Thus, to the extent *Braswell* could be read to approve of the logic in *Armco* and *Milliken,* it is hereby modified.

4. There are minor variations among the pollution exclusion clauses. Some policies state that the exception to the exclusion applies if the pollution is caused by a "sudden, unintended, and unexpected happening."

The trial court found that Helena had not put forth any evidence on the cause of the contamination and thus had not met its burden to create a factual issue.[5] According to the trial court, the evidence showed that the pesticide contamination resulted from the "incidental release of pesticides during the routine operations of grinding pesticide into dust, loading, unloading, bagging and formulating pesticides." Respondents argue that because the contamination was caused by Helena's "routine" operations, the releases of pesticide could not be considered unexpected and accidental. Helena, on the other hand, argues the releases were not "routine," and thus the evidence permits the conclusion that the releases were unexpected and accidental.

After reviewing the record, we find that the contamination at the various sites was caused by Helena's routine business operations and was, therefore, not unexpected and accidental. For that reason, we hold that Helena's claims do not fall within the exception to the pollution exclusion, and thus the insurance companies are not liable for the environmental cleanup in this case.

Helena employees tell a story of routine contamination that occurred during the ordinary course of operations. First, Bobby Pace, who worked for Helena for 38 years, testified about the release of dust into the air during grinding operations:

Q. And dust, is that referring to the fact that dust at some points in the operations at Fairfax escaped into the environment?

A. There would be some dust.

5. We note the trial court also made a finding that while the insurers bear the burden of proving that the exclusion applies, Helena bears the burden of proving the exception to the exclusion. This is a novel issue in South Carolina, and there exists a split of authority in other jurisdictions. *Compare N. Ins. Co. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 194–95 (3d Cir.1991) (noting split on the question but predicting that under Pennsylvania law, the insured bears the burden) *with New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1181–82 (3d Cir.1991) (also noting split, but predicting that under Delaware law, the insurer bears the burden). We agree with the trial court that it is the insured who bears the burden of proving an exception to the exclusion.

Q. Do you know in general how that dust would have escaped during the formulating process?

A. Yes.... In formulation you have a grinding operation. Creates a lot of dust. And you normally call it a baghouse that collects the dust, but it did not collect 100 percent of it so some dust would get out into the atmosphere.

Q. All right. So even during Helena's operations, do I understand correctly that at least some percentage of the dust that is released by the grinding operation would have actually escaped out of the processing area?

A. It's possible, if the dust collectors were not operating 100 percent.

Pace also explained that bags of pesticide would break open during the loading and unloading process, causing pesticide particles to escape into the air and onto the loading docks. Pace described the breaking open of bags as just "something that happens."

Second, James Blue, the founder of Blue Chemical Company (which merged with Helena around 1970), testified as to dust spillage:

Q. In the regular day-to-day usage of the facility was there ever any just in the normal in the course of doing operations amounts that were spilled?

A. Well, generally if you take a dust mill, sure, you've got spillage on the floor. But that stuff is swept up, put back in the blender and bagged back up.

In addition to dust spillage, Blue testified as to the spillage of liquid pesticide that occurred when pesticide was transferred from rail cars and trucks to Helena's storage tanks. He stated there "probably was some" spillage when the liquid pesticide was pumped into the storage tanks. Further, in the absence of a major, accidental spill, Blue explained that any liquid release would be "very small." He also admitted that such spillage, though small, was a normal part of operations, and he could not recall a single instance in which a sudden or accidental spill occurred at the various sites.

Third, Charles Hooks, a Blue Chemical salesman, testified that liquid contaminants routinely spilled onto the ground.

Hooks explained that the liquid chemical toxaphene was brought in by rail and tank cars. Upon arrival, the chemical would be pumped into storage tanks through a hose. When the hose was disconnected, small amounts of toxaphene would drip out. Hooks testified that "[t]here was probably a small amount [of leakage] every time you disconnected the couplings from the bottom of the tank car." Finally, Hooks testified that it was standard procedure, at the time, to deliver toxaphene to the sites in this manner.

A plant inspection conducted by Helena at the Mayesville site in 1985—to "look at possible environmental problems"— confirmed that contamination had occurred in the area where the trucks and railroad cars unloaded as described by Hooks. In addition, the inspection revealed that "the railroad track area around the warehouse door show[ed] signs of contamination."

Lastly, James Whosendove, a Helena employee of 13 years, testified that he could not remember any unexpected events in which tanks leaked, fell over, exploded, or otherwise caused a sudden emission of pesticides into the atmosphere or ground.

Together, these testimonies lead to no other conclusion than that routine discharge of pollutants occurred at the various Helena facilities during ordinary operations.

Summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *R.J. Hendricks, II v. Clemson Univ.*, 353 S.C. 449, 455, 578 S.E.2d 711, 714 (2003) (citation omitted). This Court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Id.* at 455–56, 578 S.E.2d at 714. Furthermore, since it is a drastic remedy, summary judgment should be cautiously invoked to ensure that a litigant is not improperly deprived of a trial on disputed factual issues. *Baughman v. Am. Tel. and Tel. Co.*, 306 S.C. 101, 112, 410 S.E.2d 537, 543 (1991).

Given that Helena did not present any evidence that the pollution damages at issue here were the result of unexpected or accidental discharges of pesticide and other contaminants, we find that the trial court properly resolved an issue of fact when it decided that the pollution releases were not sudden

and accidental. Accordingly, the exception to the pollution exclusion does not apply, and the insurance companies are not liable for the environmental cleanup.

## III. BAD FAITH CLAIMS

The trial court also decided that the insurers were entitled to summary judgment on Helena's bad faith claims. Helena argues this was error. We disagree.

Under South Carolina law, an insurer acts in bad faith when there is no reasonable basis to support the insurer's decision. *Cock–N–Bull Steak House, Inc. v. Generali Ins. Co.*, 321 S.C. 1, 466 S.E.2d 727 (1996). But "[i]f there is a reasonable ground for contesting a claim, there is no bad faith." *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 360, 415 S.E.2d 393, 397 (1992).

The insurers had a reasonable ground for contesting the claims associated with recovering the environmental cleanup costs. The Fourth Circuit's *Milliken* decision, which predicted South Carolina law, certainly provides a reasonable basis for finding that the cleanup costs were not "damages" within the meaning of the policies. Therefore, the insurers did not improperly contest coverage, and the trial court correctly granted summary judgment on the bad faith claims.[6]

## CONCLUSION

In sum, we hold that the plain, ordinary meaning of "damages" includes environmental cleanup costs. Therefore, the trial court erred in granting summary judgment on this issue. But because no genuine issue of material fact was presented that would lead a jury to conclude that the manner in which pollutants were discharged on the property was sudden and accidental, the trial judge properly granted summary judgment in favor of the insurers as to the pollution exclusion issue. Finally, given that the insurers had a reasonable

---

6. In their brief, respondents raise an additional sustaining ground for summary judgment involving an issue related to the excess insurers on which the trial court did **not** rule. We decline to address this issue. *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to address any additional sustaining grounds.").

ground for contesting Helena's claims, summary judgment was properly granted as to the bad faith claims as well.

Accordingly, the trial court's decision is **AFFIRMED IN PART** and **REVERSED IN PART**.

MOORE, WALLER, BURNETT, JJ., and Acting Justice J. ERNEST KINARD, JR., concur.