789 S.E.2d 63

**SOUTH CAROLINA INSURANCE RESERVE
FUND, Respondent,**

v.

**EAST RICHLAND COUNTY PUBLIC SERVICE
DISTRICT and Coley Brown, Defendants,**

**Of whom East Richland County Public
Service District is the Appellant,**

and

**Coley Brown is a Respondent.**

**Appellate Case No. 2014–000728.
No. 5393.**

Court of Appeals of South Carolina.

Heard Jan. 4, 2016.
Decided March 23, 2016.
Rehearing Denied Aug. 18, 2016.

150

Scott A. Elliott, of Elliott & Elliott, PA, of Columbia, for appellant.

Andrew F. Lindemann, of Davidson & Lindemann, PA, of Columbia, for respondent South Carolina Insurance Reserve Fund; and Kenneth Emanuel Berger, of the Law Office of Kenneth E. Berger, LLC, of Columbia, for respondent Coley Brown.

McDONALD, J.

East Richland County Public Service District (the District) appeals the circuit court's order finding the South Carolina Insurance Reserve Fund (the Fund) owed no duty to defend or indemnify the District, arguing the circuit court erred in concluding (1) the policy exclusion relied upon by the Fund did not conflict with the provisions of the South Carolina Tort Claims Act, and (2) the Fund had no duty to defend or indemnify the District. We affirm.

**FACTS**

In 2010, Coley Brown filed a complaint against the District for inverse condemnation, trespass, and negligence. The complaint alleged the District had installed a sewage force main and an air relief valve on Brown's street, and the valve released offensive odors on his property multiple times a day. Brown made repeated requests to the District to remedy the problem but, despite the District's attempts, the odor never subsided. The stench ultimately caused Brown to buy a new piece of property and move, but he was unable to sell the old property. The District tendered the complaint to the Fund pursuant to its insurance policy (the Policy), but the Fund denied coverage.

Pursuant to the Policy, the Fund is legally obligated to pay damages resulting from "[p]roperty [d]amage to which this applies caused by an occurrence." The policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which result[s] in personal injury or property damage neither expected nor intended from the standpoint of the insured."

The Policy defines property damage as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

Pursuant to Exclusion (f) (the pollution exclusion), no coverage exists for:

... **personal injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritant, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]

In March 2011, the Fund filed a complaint against the District seeking a declaratory judgment that the Fund had no duty to defend or indemnify the District in the Coley Brown matter. The Fund denied coverage based on the pollution exclusion as well as the Fund's position that the damages alleged by Brown did not qualify as "property damage" caused by an "occurrence." The District counterclaimed, seeking its own declaratory judgment that the Fund had a duty to defend and indemnify the District. In June 2011, the District and the Fund filed cross motions for summary judgment.

The circuit court held a non-jury trial in June 2012. The District's executive director and former maintenance superintendent, Larry Brazell, testified the force main at issue was installed in 1999 or 2000 and was approved by the Department of Health and Environmental Control (DHEC). The main was installed as part of a larger project that also included two nearby pump stations. The pump stations were designed to turn on and pump sewage through the force main when the sewage inside their collection wells reached a certain level. Brazell explained it was impossible to know when the pumps would turn on during a given day but posited that they could turn on once per hour or ten times per hour depending on the area's water usage or weather. Brazell testified that when the pumps activated, the air in the force main lines was forced out

through an "air vacuum valve." Brazell stated that if this air was not released, the sewer lines would explode.

Brazell further explained the sewage odor itself was usually the result of naturally-occurring hydrogen sulfide—which smells like rotten eggs—and methane. The District was not required by DHEC to control or contain either of these gases. In response to the complaints, however, the District made various attempts to remedy the odors, including using a chlorine-based chemical, installing charcoal filters, and eventually using a granulated chemical media. In May 2010, the District took steps to modify the air relief valve in front of Brown's house so that any air released from the valve would be dispersed in smaller amounts. However, Brazell explained the air relief valve was designed to force air containing hydrogen sulfide into the environment when the pumps came on and that such emissions generally happened multiple times per day. Nevertheless, Brazell offered some testimony that the situation at Brown's residence was unique because of the magnitude of the odor, the lack of prior odor complaints in the area, and the District's use of novel corrective measures to mask or eliminate the odors.

The circuit court subsequently ruled the Policy's terms controlled whether the Fund was required to defend the underlying action. Specifically, the court found the Policy's exclusion barring the inverse condemnation claim was valid and enforceable. As to the negligence and trespass claims, the court found the pollution exclusion's reference to gases and fumes encompassed the offensive odors delineated in Brown's complaint. The court also determined the discharges of offensive odors were included within the District's ordinary operations; thus, the pollution exclusion's exception was inapplicable. Finally, the court found there was no ambiguity between the policy's definition of "occurrence" and the pollution exclusion. Therefore, the court determined the Fund owed no duty to defend or indemnify the District in the underlying case.[1] The District subsequently filed a Rule

---

1. The circuit court's order also granted the Fund's motion for summary judgment, denied the District's motion for summary judgment, and dismissed the District's counterclaim with prejudice.

59(e), SCRCP, motion to alter or amend the court's judgment, which the circuit court denied.

## STANDARD OF REVIEW

"The standard of review in a declaratory judgment action is determined by the underlying issue or issues." *Horry Cty. v. Ins. Reserve Fund,* 344 S.C. 493, 497, 544 S.E.2d 637, 639 (Ct.App.2001). "The determination of legislative intent is a matter of law." *Jones v. State Farm Mut. Auto. Ins. Co.,* 364 S.C. 222, 228, 612 S.E.2d 719, 722 (Ct.App.2005). "An action to ascertain whether coverage exists under an insurance policy is an action at law." *Horry,* 344 S.C. at 497, 544 S.E.2d at 640. "In an action at law, this court will not disturb the [circuit] court's findings unless they are without any reasonable evidentiary support." *Id.*

## ANALYSIS

## I. CONFLICT WITH THE TORT CLAIMS ACT

■ The District first argues the pollution exclusion is void because it conflicts with provisions of the South Carolina Tort Claims Act[2] (The Act) requiring coverage for the underlying causes of action. Specifically, the District argues the Act requires the Fund to provide coverage for *all* risks for which immunity has been waived under the Act. Additionally, the District asserts that because its decision to purchase insurance from the Fund precluded it from purchasing additional insurance from other sources, it was improperly exposed to liability for any excluded risks. We disagree.

The Act provides, "The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein." S.C.Code Ann. § 15–78–40 (2005). The Act also lists several exceptions to the waiver of immunity. S.C.Code Ann. § 15–78–60 (2005 & Supp.2015).

The provisions of the Act detailing the District's responsibility to procure tort liability insurance are found in section 15–78–140(A) of the South Carolina Code (Supp.2015), providing,

---

2. S.C.Code Ann. §§ 15–78–10 to –220 (2005 & Supp.2015).

(A) The political subdivisions of this State, in regard to tort and automobile liability, property, and casualty insurance shall procure insurance to cover these risks for which immunity has been waived by: (1) the purchase of liability insurance pursuant to Section 1–11–140; or (2) the purchase of liability insurance from a private carrier; or (3) self-insurance; or (4) establishing pooled self-insurance liability funds, by intergovernmental agreement, which may not be construed as transacting the business of insurance or otherwise subject to state laws regulating insurance. A pooled self-insurance liability pool is authorized to purchase specific and aggregate excess insurance. A pooled self-insurance liability fund must provide liability coverage for all employees of a political subdivision applying for participation in the fund. If the insurance is obtained other than pursuant to Section 1–11–140, it must be obtained subject to the following conditions:

(1) if the political subdivision does not procure tort liability insurance pursuant to Section 1–11–140, it also must procure its automobile liability and property and casualty insurance from other sources and shall not procure these coverages through the Insurance Reserve Fund;

(2) if a political subdivision procures its tort liability insurance, automobile liability insurance, or property and casualty insurance through the Insurance Reserve Fund, all liability exposures of the political subdivision as well as its property and casualty insurance must be insured with the Insurance Reserve Fund;

(3) if the political subdivision, at any time, procures its tort liability, automobile liability, property, or casualty insurance other than through the Insurance Reserve Fund and then subsequently desires to obtain this coverage with the Insurance Reserve Fund, notice of its intention to so obtain this subsequent coverage must be provided to the Insurance Reserve Fund at least ninety days prior to the beginning of the coverage with the Insurance Reserve Fund. The other lines of insurance that the political subdivision is required to procure from the fund are not required to commence until the coverage for that line of insurance expires. Any political subdivision may cancel all lines of insurance with the Insurance Reserve Fund if it gives ninety days' notice to the

fund. The Insurance Reserve Fund may negotiate the insurance coverage for any political subdivision separate from the insurance coverage for other insureds;

(4) if any political subdivision cancels its insurance with the Insurance Reserve Fund, it is entitled to an appropriate refund of the premium, less reasonable administrative cost.

Prior to 1997, an additional subsection provided, "It is the duty of the Budget and Control Board to cover risks for which immunity has been waived under the provisions of this chapter by the purchase of insurance as authorized in § 15–78–150." [3] S.C.Code Ann. § 15–78–140(a) (Supp.1986). However, the legislature deleted this subsection in June 1997. *See* 1997 S.C. Act No. 155, Part II, § 55. The amending act stated the General Assembly "has never intended that the government or taxpayers would be subject to unlimited liability for tort actions against the government...." *Id.* The General Assembly also stated its "intent that there remain reasonable limits upon recovery against the government for tort actions, and that the government is only liable for torts as expressly prescribed and authorized in the 'South Carolina Tort Claims Act'." *Id.*

Here, the circuit court found this amendment could be construed as clarifying the duties of the Board and the Fund in light of *Town of Duncan v. State Budget & Control Board*,[4] which was decided in March 1997. Although we acknowledge that the legislature's decision to amend the statute demonstrated the legislature's intent to change the law, we do not believe *Town of Duncan*'s holding and the legislature's subsequent deletion of section 15–78–140(a) to be dispositive in this case. *See Duvall v. S.C. Budget & Control Bd.*, 377 S.C. 36, 46, 659 S.E.2d 125, 130 (2008) ("When the Legislature adopts an amendment to a statute, this [c]ourt recognizes a presumption that the Legislature intended to change the existing law.").

---

**3.** The State Budget and Control Board was abolished effective July 1, 2015. *See* 2014 S.C. Act No. 121 (S. 22), Part VII, § 19.C. The portions of 15–78–140 referencing the Board were replaced with references to the Fund. The Fund now falls under the authority of the State Fiscal Accountability Authority.

**4.** 326 S.C. 6, 482 S.E.2d 768 (1997).

In *Town of Duncan*, town employees sued the town primarily for violation of the state Whistleblower Act. 326 S.C. at 9, 11, 482 S.E.2d at 770–11. The town was insured under a tort liability policy issued by the Budget and Control Board, and brought a declaratory judgment action when the Board refused to defend or indemnify. *Id.* at 9, 482 S.E.2d at 770. The circuit court found the policy only provided coverage for claims for which immunity had been waived under the Tort Claims Act. *Id.* at 11, 482 S.E.2d at 771. However, the supreme court reversed, holding that the "statutes authorizing [the] Board to purchase insurance for governmental entities do not provide that the *only* risks Board can insure against are those waived under the Tort Claims Act." *Id.* at 12, 482 S.E.2d at 771. The supreme court noted there was no provision in the policy limiting coverage to claims allowed under the Act and concluded the Board's duty to defend or indemnify should not be predicated on whether the Whistleblower action was covered by the Act, but rather by examining the policy's terms to determine whether the policy provided coverage. *Id.* at 12–13, 482 S.E.2d at 772.

Unlike *Town of Duncan*, this case does not involve a question of whether the District's tort liability policy may provide broader coverage than that allowed under the Act. Instead, the issue is whether the legislature intended to allow tort liability policies issued by the Fund pursuant to the Act to contain a pollution exclusion that could act to bar coverage in certain situations. Because this issue involves the interpretation of a statute, our rules of statutory construction apply.

 "All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute." *Jones,* 364 S.C. at 230, 612 S.E.2d at 723. "The language must also be read in a sense which harmonizes with its subject matter and accords with its general purpose." *Id.* "Courts will reject a statutory interpretation which would lead to a result so plainly absurd that it could not have been intended by the legislature or would defeat the plain legislative intention." *Id.* at 232, 612 S.E.2d at 724. "A court should not consider a particular clause in a statute as being construed in isolation, but should read it in conjunction with the purpose

of the whole statute and the policy of the law." *Id.* "It is generally conceded that insurers have the right to limit their liability and to impose whatever conditions they desire upon an insured, provided they are not in contravention of some statutory inhibition or public policy." *Pa. Nat. Mut. Cas. Ins. Co. v. Parker,* 282 S.C. 546, 550–51, 320 S.E.2d 458, 461 (Ct.App.1984).

Based on our review of the Act, we decline to hold the pollution exclusion is void. The District purchased tort liability insurance pursuant to the portion of section 15–78–140(A) allowing a political subdivision to "procure insurance to cover these risks for which immunity has been waived" by purchasing liability insurance pursuant to section 1–11–140 of the South Carolina Code (Supp.2015). Section 1–11–140(A) authorizes the State Fiscal Accountability Authority, through the Fund, to provide insurance "so as to protect the State against tort liability and to protect these personnel against tort liability arising in the course of their employment." Section 1–11–140(B) provides, "Any political subdivision of the State ... may procure the insurance for itself and for its employees in the same manner provided for the procurement of this insurance for the State, its entities, and its employees, or in a manner provided by Section 15–78–140." Neither the Act nor section 1–11–140 explicitly state whether a pollution exclusion is a proper addition to a tort liability policy issued through the Fund.

However, the "cross references" to section 1–11–140 direct us to regulation 19–415.1, which was in existence in 1986 when the legislature enacted the Act.[5] *See* 23 S.C.Code Ann. Regs. 19–415.1 (1983); *Abell v. Bell,* 229 S.C. 1, 5, 91 S.E.2d 548, 550 (1956) ("[W]here the language of the statute gives rise to doubt or uncertainty as to the legislative intent, the search for that intent may range beyond the borders of the statute itself; for it must be gathered from a reading of the statute as a whole in the light of the circumstances and conditions existing at the time of its enactment."); *see also Young v. S.C. Dep't of Highways & Pub. Transp.,* 287 S.C. 108, 113, 336 S.E.2d 879,

---

**5.** The current version of the regulation is set forth at S.C.Code Ann. Regs. 19–415.1 (2011). Notably, the current regulation's language has not been updated to reflect the replacement of the Budget and Control Board with the Insurance Reserve Fund.

882 (Ct.App.1985) (Administrative agencies may be authorized " 'to fill up the details' by prescribing rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.").

The current version of regulation 19–415.1, which is substantially similar to the older version, states that the regulations contain a codified tort liability policy that is intended "to provide the public with information regarding the nature, terms, and scope of the insurance" provided under section 1–11–140. S.C.Code Ann. Regs. 19–415.1 (2011). That policy is entitled "General Liability Policy" and appears in a subsequent regulation. S.C.Code Ann. Regs. 19–415.3 (2011). Additionally, regulation 19–415.2 clarifies, "The nature, terms and scope of the Insurance Reserve Funds' tort liability is declared in the policy entitled 'General Liability Policy.' " S.C.Code Ann. Regs. 19–415.2 (2011). Importantly for our analysis, this General Liability Policy contains a pollution exclusion nearly identical to that at issue here. S.C.Code Ann. Regs. 19–415.3 (2011).

We believe this inclusion of such a pollution exclusion is strong evidence that the legislature did not intend to preclude the use of such exclusions, even in policies issued pursuant to the Act. As noted earlier, the Act allows the District certain options for the purchase of tort liability insurance pursuant to section 1–11–140, and the District chose this method of purchase. Because we are satisfied that pollution exclusions are valid in policies issued under the authority of section 1–11–140, we find the pollution exclusion in this case was valid.[6] *See Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 109, 536 S.E.2d 372, 375 (2000) ("It is well settled that statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result.").

---

**6.** This court has previously upheld coverage exclusions in tort policies issued by the Fund. *See e.g., City of Abbeville v. S.C. Ins. Reserve Fund*, 323 S.C. 60, 61–63, 448 S.E.2d 579, 580–81 (Ct.App.1994) (holding the Fund was not required to pay for damage to a monument based on an exclusion in the city's tort liability policy that excluded coverage for damage to property in the care, custody, and control of the insured).

## II. COVERAGE UNDER THE POLICY

### A. Applicability of the Pollution Exclusion

■ Next, the District asserts the pollution exclusion is inapplicable because it does not mention offensive odors or explain why such odors should be considered as pollution when they are not harmful and not regulated. We disagree.

■ "Questions of coverage and the duty of a liability insurance company to defend a claim brought against its insured are determined by the allegations of the complaint." *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund,* 382 S.C. 535, 543, 677 S.E.2d 574, 578 (2009). "If the underlying complaint creates a possibility of coverage under an insurance policy, the insurer is obligated to defend." *Id.*

■ "Insurance policies are subject to the general rules of contract construction." *Am. Credit of Sumter, Inc. v. Nationwide Mut. Ins. Co.,* 378 S.C. 623, 628, 663 S.E.2d 492, 495 (2008). "We must give policy language its plain, ordinary, and popular meaning." *Id.* "An insurance policy is to be liberally construed in favor of the insured and strictly construed against the insurer." *Id.* at 628–29, 663 S.E.2d at 495. "Further, exclusions in an insurance policy are always construed most strongly against the insurer." *Id.* at 629, 663 S.E.2d at 495. The insurance company "bears the burden of establishing [an] exclusion's applicability." *Owners Ins. Co. v. Clayton,* 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005).

We hold the pollution exclusion applies because the odors at issue in this case can be properly classified as "fumes" or "gases," both of which are listed in the exclusion. Giving these words their plain and ordinary meaning, we find the word "gas" is defined as "a substance that can be used to produce a poisonous, asphyxiating, or irritant atmosphere" and "fume" is defined as "a smoke, vapor, or gas esp[ecially] when irritating or offensive." *Merriam Webster's Collegiate Dictionary,* 472, 481 (10th ed.1993). Although the District argues the odors must be harmful in some way to be considered pollutants, we decline to impose such a limitation on the plain language of the policy and believe the fact that the odors were comprised of irritating and offensive gases suffices to demonstrate the odors are encompassed within the ordinary

meaning of the pollution exclusion's terminology. Notably, this holding comports with several other jurisdictions holding that foul odors are encompassed by such pollution exclusions. *See City of Spokane v. United Nat. Ins. Co.*, 190 F.Supp.2d 1209, 1221 (E.D.Wash.2002) (holding pollution exclusions "clearly and unambiguously" excluded coverage for losses related to odors emanating from a compost facility); *Kruger Commodities, Inc. v. U.S. Fidelity and Guar.*, 923 F.Supp. 1474, 1479–80 (M.D.Ala.1996) (finding a pollution exclusion applied to odors produced by an animal rendering plant even though the relevant chemicals were not hazardous and did not violate environmental laws); *Wakefield Pork, Inc. v. Ram Mut. Ins. Co.*, 731 N.W.2d 154, 160 (Minn.Ct.App.2007) (finding the substance of a complaint alleging harm from gases and odors emanating from manure at a nearby pig farm was "plainly covered" by a policy's pollution exclusion that mentioned gases and fumes); *City of Bremerton v. Harbor Ins. Co.*, 92 Wash. App. 17, 963 P.2d 194, 195–98 (1998) (finding no coverage for damages resulting from a treatment plant's emission of foul odors and toxic gases when a pollution exclusion "unambiguously exclude[d] claims arising from 'fumes' and 'gases' ").

**B. Applicability of the Exception to the Pollution Exclusion**

 The District argues that even if the pollution exclusion applies, the exception to the exclusion operates to require coverage because the circumstances surrounding the release of the odors were unique and unexpected. We disagree.

The exception applies if "such discharge, dispersal, release or escape [of pollutants] is sudden and accidental." The term "sudden" has been held to be ambiguous, and must be interpreted as "unexpected." *See Greenville Cty. v. Ins. Reserve Fund*, 313 S.C. 546, 548, 443 S.E.2d 552, 553 (1994) (holding the word "sudden" in an exception to a pollution exclusion was ambiguous and should be interpreted as "unexpected"). "[I]t is the insured who bears the burden of proving an exception to [an] exclusion." *Helena Chemical Co. v. Allianz Underwriters Ins. Co.*, 357 S.C. 631, 642 n. 5, 594 S.E.2d 455, 460 n. 5 (2004).

In *Helena Chemical*, a chemical company filed a declaratory judgment action seeking reimbursement from various insurers

after they denied coverage for costs spent cleaning up pollution at three sites. *Id.* at 634–35, 594 S.E.2d at 456–57. The circuit court granted summary judgment in favor of the insurers, finding the chemical company's claims fell under the policies' pollution exclusion, which contained an exception stating "this exclusion does not apply if such discharge, release or escape is sudden and accidental." *Id.* at 635, 641, 594 S.E.2d at 457, 460.

On appeal, the supreme court explained, "[P]roperty damage caused by pollution arising from ordinary business operations is not covered. But if the damage were caused by a 'sudden and accidental' discharge, release, or escape of pollutants, then the insurers must provide coverage." *Id.* at 641, 594 S.E.2d at 460. The court then noted that based on the holding in *Greenville County,* the term "sudden" was to be interpreted as unexpected. *Id.* at 641, 594 S.E.2d at 460.

Ultimately, the court concluded the chemical company's contamination of the sites was the result of its routine business operations and was not unexpected. *Id.* at 642, 594 S.E.2d at 460. Notably, one employee testified that when the chemical company ground its pesticide into dust, some of the dust escaped out of the processing area into the atmosphere despite the use of dust collectors. *Id.* at 642–43, 594 S.E.2d at 461. Another employee stated that dust that spilled onto the floor was swept up, put back into a blender, and bagged. *Id.* at 643, 594 S.E.2d at 461. Employees also testified that bags of pesticide occasionally broke open and liquid pesticide routinely spilled during the loading, transport, and unloading process. *Id.* at 643–44, 594 S.E.2d at 461.

We hold the releases of the odors here were not accidental and unexpected, thus, the exception does not apply. Brazell testified the air release valve was essential to the operation of the sewer line because it prevented the lines from exploding. Brazell also stated the District was aware that when the sewer pumps turned on, they would force air containing hydrogen sulfide into the environment. Although Brazell stated it was impossible to know when the pumps would turn on during a given day, he also acknowledged the pumps usually turned on several times a day. Accordingly, the District's knowledge that the pumps would turn on occasionally is sufficient to demonstrate that the releasing of the odors was not only

expected, it was a necessary function of the line's normal operations.

Although the District asserts this situation was unexpected due to the magnitude and impact of the odors upon the residents at this particular location, we are not persuaded by this argument. Despite the District's efforts to mask or limit the odors at this particular location, the release of the valve gases was a routine and expected function of the system. Thus, the circuit court properly declined to apply the pollution exclusion's exception.[7]

For the foregoing reasons, the order of the circuit court is **AFFIRMED.**

SHORT and GEATHERS, JJ., concur.

---

7. The Fund raised an additional sustaining ground that the damages sought by Brown in the underlying action do not qualify as "property damage" as defined by the Policy. However, we decline to address this argument given our disposition of the prior issues. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).